**STATE of Minnesota, Respondent,**

v.

**Donald Albin BLOM, Appellant.**

**Nos. C2–00–1994, C3–02–1829.**

Supreme Court of Minnesota.

July 1, 2004.

Rehearing Denied July 22, 2004.

582

Charles A. Ramsay, Rebecca Rhoda Fisher, Ramsay, Devore & Olson, P.A., Roseville, MN, for Appellant.

Mike Hatch, Attorney General, John B. Galus, Assistant Attorney General, Thomas Ragatz, Assistant Attorney General, St. Paul, MN, Marvin E. Ketola, Carlton County Attorney, Carlton, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

On August 16, 2000, a Saint Louis County jury found Donald Albin Blom guilty of murdering Kathlyn "Katie" Poirier. Specifically, Blom was convicted for causing "the death of a human being with intent to effect the death of the person * * *, while committing or attempting to commit * * * kidnapping." Minn.Stat. § 609.185(a)(3) (2002). The district court sentenced Blom to life in prison, without the possibility of parole. On appeal, Blom raises several issues as to why his conviction should be overturned. He claims that the court erred when it (1) denied numerous motions to change venue, continue the trial, and sequester the jury; (2) failed to prevent extra-judicial statements about his case; (3) failed to control the courtroom; (4) denied his self-representation motion, (5) admitted *Spreigl* evidence; (6) admitted his statement to law enforcement authorities; and (7) excluded alternative-perpetrator evidence. He also claims that he was denied effective assistance of trial counsel. We affirm the conviction.

At about 11:38 on the evening of May 26, 1999, 19–year–old Kathlyn Poirier was abducted while working at DJ's Expressway, a convenience store located near Interstate 35 on the outskirts of Moose Lake, Minnesota. The abduction was recorded on the store's videotape surveillance system, but the poor resolution of the images on the video did not allow the police to determine the abductor's identity with any certainty. The video did show that the abductor was a white male who was wearing a T-shirt with a New York Yankees insignia on the front and the number 23 on the back.

An extensive search and investigation were conducted, accompanied by extensive local and statewide news coverage. As part of the investigation, the police interviewed Kathryn Hanek, who, on the night of the abduction, was working at the Subway sandwich store adjacent to DJ's Expressway. The two stores are connected by an internal door. Hanek told the police that shortly before closing the Subway store at about 10:00 p.m., she saw a man in and around the Subway store who was behaving strangely. After closing, Hanek drove home toward downtown Moose Lake and, coincidentally, followed the man, who was leaving the convenience store property at the same time. She noted that the man was driving a black Ford F150 extended cab pickup truck with white markings on the side and a license plate that read in part, 557 — —Y. The pickup truck weaved a number of times and after entering

Moose Lake, pulled into the parking lot of a local cafe. Hanek stated that when she left work, Poirier's vehicle was still at DJ's Expressway.

*Blom's Arrest*

On June 18, after seeing a composite sketch of Poirier's abductor, one of appellant Donald Albin Blom's coworkers contacted the police to report Blom as a possible suspect based on his belief that Blom had behaved suspiciously during the week of the abduction. Upon investigating this report, the police determined that Blom drove a black Ford F150 extended cab pickup truck with license plate number 557 HDY. The police then attempted to locate Blom. The police also learned that Blom had property near Kerrick, less than 10 miles from DJ's Expressway. They secured this property the evening of June 18 and conducted a 12–hour search of the property on June 19. An examination of a fire pit on the property resulted in the discovery of a number of bone fragments, including what appeared to be part of a jaw bone and a human tooth. The bone fragments were collected for evaluation by a forensic anthropologist. This property was searched again on June 29.

Police located Blom after midnight on June 20 at a campground near Alexandria, Minnesota. The police questioned him about Poirier's abduction and he denied any involvement. He said he had been at his property near Moose Lake on May 14 or 15 and again on June 12. Blom said that on May 26 he left work early and went fishing on the Kettle River, a mile or two south of Sandstone, but claimed he was home in Richfield by between 7:00 and 8:00 p.m.

Later on June 20, the police arrested Blom. At a police line-up the day following Blom's arrest, Hanek positively identified Blom as the man she had seen on the convenience store property the night of May 26. On June 23, Blom was charged by complaint with kidnapping, in violation of Minn.Stat. § 609.25, subd. 1(2) and (3) and subd. 2(2) (2002). He was confined at the Carlton County Jail and bail was set at $285,000. He was arraigned on July 1. He first retained private counsel, but on July 23, a public defender was appointed after private counsel received permission from the district court to withdraw.

*Blom's Request To Make a Statement*

On August 10, Blom began sending notes to Carlton County Sheriff David Seboe. Blom sent Seboe approximately six to eight notes in August and early September. In a note sent on September 3, Blom requested to speak to Seboe. Suspecting that Blom was about to confess to Poirier's murder, Seboe proceeded to arrange a meeting for that evening with Blom, Blom's counsel, and law enforcement officials. Blom's lead state defense counsel could not be reached, but his federal public defender and the chief public defender for the Sixth Judicial District were able to attend the meeting.[1] At the meeting, Blom was advised by his counsel not to speak. Counsel warned him that no "offers" had been made and that anything he said could be used against him. In response to these warnings, Blom stated, "I wanta accept an offer cause I'm tired of this." Nevertheless, the meeting ended

1. Blom was represented by a federal public defender because he was charged by the federal government for being a felon in possession of a firearm, a charge which was the result of firearms being seized when his property near Kerrick was searched. Blom was ultimately convicted of this offense. The federal court sentenced Blom to prison for 235 months (19 years and seven months) and he is to be on supervised release for five years following the completion of the federal sentence. The Eighth Circuit Court of Appeals affirmed this conviction. *United States v. Blom*, 242 F.3d 799 (8th Cir.2001).

without Blom making a statement.[2] Blom then met with his counsel over the next several days regarding whether he should make a statement and what, if any, concessions to seek. On September 7 and 8, both the state and federal prosecuting attorneys sent letters to Blom's state and federal defense counsel outlining the terms of a proposed agreement with Blom. The state's September 7 letter, which made reference to a "plea agreement," stated that Blom was to provide "a complete, a detailed, statement regarding the abduction and murder of Ms. Katie Poirier," as well as plead guilty to both the state and federal charges.[3]

The state noted in its letter that it intended to convene a grand jury for the purpose of obtaining an indictment as soon as Blom gave his statement. Further, as a result of his plea, Blom would be sentenced to life in prison without the possibility of parole, his federal and state sentences would run concurrently and he would be imprisoned in a state prison in North Dakota. Blom had previously requested that he be imprisoned outside

Minnesota for safety reasons. He specifically requested either North Dakota or South Dakota because he wanted to remain close enough to Minnesota so that his family could maintain contact with him.

The state also represented in its letter that it would not bring criminal charges against Blom's wife or bring forfeiture proceedings against property owned by her, and that forfeiture proceedings would be dropped against Blom's truck. The state agreed that personal property lacking evidentiary value would be returned to Blom's family, Blom would be permitted to wear street clothes rather than jail fatigues when he pleaded guilty, and, as long as he followed jail rules, he would be granted more time outside of his jail cell and additional phone privileges while housed in the Carlton County Jail. Blom initialed every page of the state's letter except the last page where he signed his full name.

The conditions outlined by the federal government were that Blom provide a detailed and complete account of Poirier's abduction and murder, plead guilty to the

---

**2.** On the same day Blom approached Seboe about making a statement, Friday, September 3, he met with a television news reporter at his own request. According to the reporter's broadcast report on September 7, the reporter met with Blom for 30 minutes, during which time the reporter took six pages of notes. The reporter stated that during the interview, Blom "made it clear he wasn't ready to share with me the whole story regarding Poirier, but promised if I came back on Monday, he'd tell me 'what everybody wants to hear.' " The reporter also said that when he asked Blom if the tooth found in the fire pit was Poirier's, "he said it could be."

**3.** The letter from the state read in part as follows:

After lengthy discussions it is my understanding that your client will provide the State with a complete, a detailed, statement regarding the abduction and murder of Ms.

Katie Poirier dating back to May 26, 1999. The statement will be taken as soon as possible, after having gone through the details of a proposed plea agreement that encompasses both the State charges and pending Federal gun charges.

As I have informed you, upon taking your client's statement it is the [s]tate's intention to convene a Grand Jury for the purposes of indicting your client with a First Degree Murder charge * * *.

In return for a plea of guilty to [first-degree murder], your client will also be entering a plea of guilty to the Federal weapons charges and that particular sentence, whatever that may be, would run concurrent with the State sentencing.
* * * *
I believe I have covered all the items we discussed at length and certainly, the plea petition itself will incorporate our understanding and any additional information that is required by rule or statute.

state and federal charges, agree to a life sentence without the possibility of parole, waive all rights to appeal, and forfeit all rights to firearms seized on his property.[4] While Blom did not sign this letter, his federal defense counsel explained at a September 23 hearing that the letter accurately reflected the oral agreement between counsel and the federal government.

*Blom's Statement*

On September 8, Blom gave a statement to the police regarding his involvement in Poirier's abduction and murder. Before Blom started his interview with the police, his lead state defense counsel had an extended conversation with him in order to verify that Blom understood the consequences of what he was about to do. Blom verified on the record that his counsel had met with him for several hours between September 6 and September 8 and that he intended to give a statement, but that he first wanted his counsel to negotiate some terms on his behalf. Blom indicated that these terms were contained in the September 7 letter from the state and acknowledged that his counsel negotiated these terms on his behalf. He affirmed that his counsel advised him not to give a statement.[5] Later during the statement,

Blom's federal defense counsel arrived and also verified with Blom that he was going through with this "plea negotiation" against his counsel's advice.

In his statement, Blom admitted abducting Poirier by forcing her to leave DJ's Expressway and that he "pushed" her into his truck. He said he then drove Poirier to his property near Kerrick where he "choked" her to death. Blom stated that he "threw" Poirier's body in a fire pit on his property and burned the body using fence boards, but did not use an accelerant. During the statement, Blom affirmed, albeit somewhat equivocally, that the bones recovered by the police from his fire pit belonged to Poirier. He stated that he did not sexually assault Poirier, but that he may have been thinking about it. Throughout his statement, Blom was generally not forthcoming with information, claiming to not remember many details, including his interactions with Poirier.

Immediately following Blom's statement, his counsel met with the news media. At this meeting, his lead state defense counsel announced that the parties had been in

---

4. The letter from the federal prosecutor read in part as follows:

 This letter confirms and clarifies our plea negotiations to date in this matter. The United States is willing to agree to a concurrent federal sentence and to allowing defendant to serve that sentence in state custody provided that all of the following conditions are satisfied:

 1. Defendant provides a detailed and complete accounting of his role in the kidnapping and murder of Katie Poirier;

 2. Defendant pleads guilty to First Degree Murder under the recently amended Minnesota Statutes § 609.185(3) for the intentional death of another person while committing a kidnapping * * *.

5. The following is part of the exchange between Blom and his state defense counsel:

 Blom's counsel: You understand that, ah, if you make this statement pursuant to this agreement that you have to agree to answer their questions and you have to answer 'em truthfully.

 Blom: Correct.

 Blom's counsel: And that if, ah, you wanna stop making this statement you can do that. No one can prevent you from stopping the statement, but that if you stop the statement, that's a violation of the Letter of Agreement and that you would then be in a situation where, ah, whatever you had said to these people could be used against you if we went to trial and this deal or this Letter of Agreement that we have would not, would not, ah, be honored.

 Blom: Correct.

"negotiations most of the day," the "details of a letter of intent" had been accepted, and "[Blom] has admitted to both the kidnapping and the killing of Katie Poirier." Blom's state defense counsel said that Blom made the statement "out of his feelings for the Poirier family and certainly out of the feelings for his own family," and that Blom "wanted to get the matter behind him." State defense counsel noted that he objected to Blom giving the statement "[b]ecause quite frankly in a plea bargain, both sides get something and I don't believe that Mr. Blom obtained—got much in this agreement." Both state and federal defense counsel indicated that Blom's major concern was where he would serve his sentence, but there were, as state defense counsel said, "other minor details" in the agreement.

As previously noted, Blom originally requested that he be imprisoned in either South Dakota or North Dakota. While the negotiations leading to the plea agreement were taking place, the district court was made aware of Blom's specific request as to where he would be imprisoned. According to a "Bill of Particulars" prepared by the court and presented to the Chief Public Defender for the Sixth Judicial District on September 27, 1999, Blom's state defense counsel and the state requested the court's assistance in "exploring the possibility of meeting that condition with the Minnesota Department of Corrections." The court contacted the Deputy Commissioner of Corrections in charge of adult facilities who then took the matter directly to the Commissioner of Corrections. The commissioner then made arrangements with the North Dakota Commissioner of Corrections for Blom's placement in North Dakota. The court further explained in its Bill of Particulars that, after Blom's placement in North Dakota was arranged, "the parties continued to meet through the 7th and during the 8th of September regarding other conditions of the plea agreement that did not need this court's assistance."

*Post–Statement Proceedings*

On September 16, a grand jury indicted Blom for first-degree murder, Minn.Stat. § 609.185(3) (2002).[6] Among the evidence presented to the grand jury was Blom's September 8 statement. A closed hearing in state court also was held that day, but no plea was entered. At that hearing, Blom's counsel, for the first time, informed the court that Blom was uncomfortable entering a guilty plea before the completion of DNA testing on the bones found on his property. Counsel also expressed reluctance to have Blom enter a guilty plea because counsel believed that Blom's version of the disposal of Poirier's body by burning was impossible. The state responded by explaining that the DNA testing could take as long as three months and would not necessarily be conclusive.[7] The court then asked Blom's counsel to verify with Blom that he was telling the truth about Poirier's abduction and murder and to determine his intention regarding a guilty plea. The court then adjourned so that counsel could talk to Blom. The next day, the federal government withdrew the

---

6. In Minnesota, the only means available to charge a person with first-degree murder is by grand jury indictment. Minn. R.Crim. P. 17.01.

7. The prosecutor noted that the DNA testing might not return any definitive results because of the condition of the bones. He went on to state that testing was also being done on the tooth found in the fire pit and that this tooth was the number 18 tooth. He stated that Poirier's dentist had worked on Poirier's number 18 tooth in May using a newly marketed 3M adhesive containing zirconium. The prosecutor added that the 3M adhesive was the only adhesive that contained zirconium and that zirconium was detected on the recovered tooth.

agreement it had offered to Blom, citing Blom's refusal to plead guilty to the state charges and noting that his federal trial was set to begin in less than six weeks—on October 25.

At a subsequent closed state court hearing on September 22, Blom stated that he had not rejected the federal agreement, but that the federal government had. In order to reassure Blom that his sentence would be served in North Dakota if he were to plead guilty, the court explained that because the state charges were made before the federal charges, Blom's sentence to a state prison would take precedence over any federal sentence. The court explained to Blom that the federal judge assigned to his case was in agreement on this point. The court stated that Blom had the right to withdraw his plea if the agreement to imprisonment in North Dakota fell through. Blom appeared to understand that the federal government had accepted the terms in the letter. The court then commented that the federal government did not have any leverage and that this agreement could be accomplished only through the state proceedings.[8]

The next day, September 23, the federal government provided a letter in which it formally agreed to reinstate its terms for one day. This reinstatement letter came fifteen days after the completion of negotiations and Blom's statement; seven days after the grand jury indicted Blom for first-degree murder and he failed to enter a plea; and six days after the government had initially withdrawn its terms. At a hearing that day, Blom's state defense counsel acknowledged that waiting for the

DNA testing results was not part of the original agreement. The district court asked Blom if there was any part of the plea agreement he had misunderstood or was not reflected in the written agreement. Blom replied that there were "a few things." The court then explained to Blom that according to the federal government's reinstated terms, September 23 was the last day to plead guilty to the state charges.

Blom responded to the district court by emphasizing that he did not want much from the agreement other than for his family to be left alone. He stated that his family was still not being left alone and noted that, soon after the September 8 agreement, discovery documents had been opened to the public, his trailer had been burned down, his wife continued to receive threatening calls, and he was being "threatened at night." Although he asserted that "this letter" was different from the state's letter, Blom did not describe what was different. The court asked Blom's state defense counsel whether Blom had given his statement without understanding the agreement. Blom's counsel replied that this was "an omnibus issue" and asserted there were terms in the federal September 8 letter that were not part of the state's September 7 letter, but he did not specify which terms.

The district court then asked Blom's federal defense counsel if he had talked to the federal prosecutor about the oral agreement and the state's letter. Defense counsel stated that the oral agreement was "accurately reflected" in the state's

8. On September 23, 1999, defense counsel filed notice—dated September 22—to remove the district court judge. On September 28, Blom's state defense counsel filed a request with the Chief Judge of the Sixth Judicial District for an order disqualifying the district court judge "on the grounds of interest and bias." On September 29, the district court judge ordered the removal of Blom's state defense counsel from the case. The Chief Judge then removed the district court judge on October 12 and named a replacement judge in the same order.

letter, but that there were "one or two differences" between the oral agreement and the federal government's September 8 letter. The court asked if counsel had contacted the federal prosecutor upon receiving the September 8 letter. Counsel replied there had been no communication regarding any conflicts between the oral agreement and the September 8 letter. The court then asked the state if there was anything discussed and negotiated that was not reflected in the agreement. The state replied that everything that was talked about was in its September 7 letter.

When the district court indicated that it was about to end the closed hearing, Blom's state defense counsel interjected and described for the record his understanding of the federal government's position based on its September 23 reinstatement letter. Counsel stated that the government's plea offer was only open for one day and added that this term was not in the original agreement. He also noted that the September 23 letter required Blom to meet two particular conditions of the September 8 letter—namely, enter a plea of guilty to first-degree murder on September 23 and at the same time waive his right to appeal. He added that the September 23 letter required Blom to meet every condition of the September 8 letter before the federal government would be bound by the letter's terms.

The district court then interposed that the state and federal agreements were separate. This comment was followed by Blom's state defense counsel explaining that the federal and state charges were to be resolved together and that the federal terms were part of the state's September 7 letter. When the court asked if there was any part of "the federal letter" that was contradictory to his understanding of the

agreement, Blom's state defense counsel replied "Absolutely," but did not explain this response other than to say it was an "omnibus issue." Shortly after the end of the closed hearing, when asked by the court at an open hearing if he wished to enter a plea, Blom told the court that he was not going to enter a plea. Blom never did enter a plea.

In essence, the state's position at the September 23 hearing was that everything that was discussed and negotiated was reflected in its September 7 letter. Blom's federal defense counsel took the position that the oral agreement with the federal prosecutor was summarized in the September 7 letter and the September 8 letter generally reflected the terms of this agreement; but there were "one or two differences" which counsel did not specify. Blom's state defense counsel stated there were terms in the September 23 letter that were "not part of the State agreement"— apparently referring to the deadline, the requirement that Blom meet two particular terms of the September 8 letter on September 23, and that the federal government was not bound until Blom met all of the conditions in the September 8 letter.

*Attempts to Suppress Blom's Statement*

In December 1999, Blom's state defense counsel filed a motion to suppress Blom's September 8 statement on the ground it was part of an offer to plead guilty and Minn. R. Evid. 410 prohibited its admission. The district court denied the motion, finding that Blom did not subjectively expect that the statement was part of plea negotiations and, therefore, was not protected by Rule 410. The court noted that Blom made several requests to Sheriff Seboe to discuss his situation, including a request to "resolve this matter," and he disclosed details of the abduction to a reporter on September 3. The court found it especially relevant that Blom's counsel

warned Blom on September 3 and again on September 8 not to make any statement because it could be used against him. The court also found that Blom agreed to allow the state to use the statement against him for the purpose of obtaining a grand jury indictment. The court stated that "typical plea negotiations did not occur" here because: there was no bargained-for exchange, Blom repeatedly initiated contact with Seboe to make a statement, no specific plea offers were extended, and the state did not encourage negotiations. The court found that Blom "did not specifically seek anything in return" and had agreed to plead guilty to an offense that was a more serious offense than the one he was charged with at the time and which had a greater penalty. The court also found that Blom's counsel began discussions only after Blom tried to confess. Therefore, the court concluded, the statement remained separate from any plea negotiations.

Finally, the district court concluded that, regardless of whether the statement was part of plea negotiations, Blom knowingly and voluntarily waived any claim to have the statement suppressed. The court found that Blom was repeatedly advised by counsel that the statement would be "admissible against him at trial," would be used to obtain an indictment by the grand jury, and that Blom fully understood the repercussions of the statement.

### Pretrial Motion to Change Venue

On December 6, 1999, Blom moved to change venue from Carlton County to a "more suitable location." Blom argued that it would be difficult to find fair and impartial jurors in Carlton County due to the extensive local publicity and because so many people from the county had been involved in the search for Poirier. Blom urged the district court to move the trial from Carlton County, but left the specific location to the court's discretion, with the understanding that his motion could be renewed if the new site did not work out. The state agreed with Blom that there was a basis to change venue, but argued that the court did not need to "go very far" from Carlton County to find fair and impartial jurors.

The district court granted Blom's motion, changing venue to Saint Louis County, specifically, the City of Virginia, which is approximately 65 miles from the Carlton County Courthouse. In moving the trial to Virginia, the court noted that most of the state had been inundated with media coverage, thereby making it difficult to find jurors anywhere in the state who were unfamiliar with the case. The court concluded that Virginia was convenient to the parties and at the same time free from the significant community involvement that existed in Carlton County.

### Motions Made During Voir Dire

Blom's trial took place at the Saint Louis County Courthouse in Virginia. Voir dire began on June 5, 2000, and lasted 20 days. During this time, Blom moved for a change of venue nine times or, in the alternative, for a continuance. During this time, he also made two motions to sequester the jury.

The motions to change venue were based on Blom's contention that answers to the jury questionnaires suggested bias against him by individual jurors, as well as by the community. Blom also argued that jury exposure to the case outside the courtroom and the potential for jury exposure to prejudicial publicity made a further change of venue necessary. In denying the motions to change venue, the district court acknowledged that the pretrial publicity was extensive, but concluded that no evidence had been provided to indicate that any part of Minnesota had been shielded from such publicity. The court stated that it could not conclude that the

jury had been adversely affected by any exposure to publicity or inadmissible evidence or that the jury would be unfair, but the court indicated it would reconsider Blom's motion if it became necessary.

In conjunction with one of Blom's motions for change of venue, he moved for the alternative relief of continuing his trial for one year. The district court denied the motion, concluding that publicity would resume the month before the trial was reinitiated and therefore a continuance was pointless. The court noted that it shared Blom's concern that he receive a fair trial and recognized the difficulties Blom faced, but the court expressed faith in the jury system and the seated jurors and expressed its belief that Blom would receive a fair trial. The court also denied Blom's two requests to sequester the jury. The court concluded that sequestration was not essential at that time.

*Subsequent Motions to Sequester the Jury*

On July 10, Blom formally moved to sequester the jury, arguing that the criminal procedure rule governing sequestration was meaningless if his case did not warrant sequestration.[9] The district court held a hearing on the motion after the completion of voir dire. At this hearing, Blom argued that sequestration was needed in light of the high volume of media coverage, the denial of the numerous requests for change of venue, the difficulty in showing actual prejudice, and the fact that many jurors had indicated that they had seen or heard information about the case. The state argued that sequestration would be difficult for the jurors, given that the

trial could be lengthy, and would increase the risk of jurors dropping out.

The district court denied Blom's motion to sequester the jury. While acknowledging the high profile of Blom's case, the court stated that it would continue to admonish the jury not to read or listen to anything about the case or to discuss it with anyone. The court also noted that the press and the public would be excluded from hearings conducted outside the presence of the jury. The court stated that if highly prejudicial matters came to the attention of the jurors, it would re-evaluate Blom's motion to sequester. The next day, after further juror questioning, Blom again moved for sequestration. The motion was again denied.

On the first day of trial, the district court granted defense counsel's request that the court question members of the jury further regarding whether they had been contacted about the case or had seen or heard news about the case since being seated. While a few of the jurors acknowledged seeing an article or headline or being approached about the case, they also explained that they stopped reading or talking about the case when they realized that Blom's trial was the subject of the conversation or article. Blom then sought a further change of venue, as well as sequestration of the jury. He did so based upon his renewed concern about some answers given by jury members. The court denied the motions and reiterated that the jurors would be admonished not to deal with this case outside of trial.

---

9. Minnesota Rule of Criminal Procedure 26.03, subdivision 5(2), reads:

> *On Motion.* Either party may move for sequestration of the jury at the beginning of the trial or at any time during the course of the trial. Sequestration shall be ordered if it is determined that the case is of such

notoriety or the issues are of such a nature that, in the absence of sequestration, highly prejudicial matters are likely to come to the attention of the jurors. Whenever sequestration is ordered, the court in advising the jury of the decision shall not disclose which party requested sequestration.

*State's Evidence at Trial*

The state's theory of the case was that Blom kidnapped Poirier from DJ's Expressway, forced her into his truck, drove to his property near Kerrick, strangled her, and burned her body in his fire pit. The state was required to prove beyond a reasonable doubt that Blom kidnapped Poirier, Poirier died, Blom killed her, and that he intended to kill her. A redacted version of Blom's September 8 statement was presented to the jury. The following evidence also was presented by the state.

a. *Evidence Relating to Whether Poirier was at Blom's Kerrick Property*

The state submitted as evidence the bone fragments and tooth the police recovered from Blom's fire pit. The police testified that the condition of the ashes in the fire pit suggested there had been a recent fire that had been fueled by accelerants. A forensic anthropologist testified that the bone fragments and tooth were those of a young adult female between the ages of 15 and 24, with a mean age of 19.4 years. The anthropologist analyzed the burned skeletal remains to determine the condition of the bones before incineration. She concluded the bones had an organic component and therefore were fresh. The anthropologist stated that the full skeleton was not in the fire pit and that the cause of death could not be determined.

A Duluth dentist testified that on August 27, 1991, he had placed a one-surface occlusal amalgam cavity filling in Poirier's lower left second molar-tooth number 18. The dentist testified he "prepped" the cavity with Dropsin, a Swedish cavity lining material containing a large amount of zinc. A second Duluth dentist testified to having treated Poirier on May 12, 1999, less than two weeks before the abduction. This dentist replaced the existing filling in tooth number 18 with another amalgam filling,

using a bonded acid-etch technique and a 3M bonding product known as Rely X ARC. The dentist testified that she first used this bonding agent after receiving samples the previous month—April 1999—from a 3M distributor at a dental convention. A 3M chemist who supervised the development of Rely X ARC testified that the product was first shipped to the marketplace in February or March 1999. A forensic scientist in the Bureau of Criminal Apprehension's (BCA) microanalytical section testified that the tooth recovered from Blom's fire pit was consistent with a human tooth number 18 that had been treated with a dental amalgam that had been bonded to the tooth with Rely X ARC. Finally, a faculty member at the University of Minnesota School of Dentistry testified that the recovered tooth had been treated with the acid-etch technique.

Based on comparisons between the tooth and jaw-bone fragments found in the fire pit and Poirier's dental x-rays and medical records, the state's two forensic dentists testified that, to a reasonable degree of medical certainty, the tooth belonged to Poirier. The dentists' conclusions were based on the following findings:

(1) The recovered tooth and Poirier's tooth (lower left second molar, number 18) both had an extra, distinctively similar-looking root. Typically, tooth number 18 only has two roots.

(2) A comparison of Poirier's dental x-rays of 1994 and 1997 to x-rays of the recovered tooth and jaw fragments revealed various conformities in root size and shape, tooth structure, and physical characteristics of the area where the tooth was filled.

(3) The recovered tooth contained zirconium and silicon on its surface in roughly the same proportions present in a bonding agent used for a cavity filling called Rely X ARC, which bonding agent

was used on Poirier's tooth for a cavity filling approximately two weeks before her disappearance and was only first introduced to the market approximately three months before it was used on Poirier's tooth.

(4) The recovered tooth contained a small amount of zinc, which was used in an earlier filling of Poirier's tooth in 1991.

(5) Both the recovered tooth and Poirier's tooth had been filled using the acid-etch method of cavity filling.

During cross-examination, the defense presented testimony to show that the acid-etch technique used to fill the recovered tooth had been in use since 1955. The defense also presented evidence that when the state's chief dental expert first examined the tooth on June 25, 1999, she considered that the tooth might be of animal origin. Then, on July 2, this expert and the state's other dental expert identified the tooth as human tooth number 30, which is the lower right first molar, but eliminated Poirier as the owner. On August 20, the state's chief dental expert stated that the tooth was not number 30, but rather number 18, and made a possible identification of it being Poirier's tooth. Approximately two days before trial, after reviewing all the information the expert had about the tooth, including the chemical reports, she changed her conclusion to a reasonable degree of medical certainty that the tooth was Poirier's.

The defense presented its own forensic dentist who, upon reviewing the same information available to the state's forensic dentists, concluded that while the tooth was a human tooth, "clearly inconsistent" ante-mortem and post-mortem data excluded the tooth as being from Poirier. Blom's expert forensic dentist based his conclusion on the following:

(1) There was not enough basis to make a good comparison with Poirier's dental records because the enamel cap, a good portion of the root, and the filling of the recovered tooth were missing, and because the tooth was 20–25% smaller than Poirier's tooth—although this possibly could be due to shrinkage from burning.

(2) The shape of the fillings in the x-rays of the recovered tooth and Poirier's tooth did not match.

(3) The shape of the front root in the x-rays of the recovered tooth and Poirier's tooth did not match.

(4) There was no value in comparing a post-mortem *post*-filling x-ray with a pre-mortem *pre*-filling x-ray.

b. *Evidence Connecting Blom to DJ's Expressway*

Hanek testified that she was working on the night of May 26 in the Subway store adjacent to DJ's Expressway. Shortly after closing time, a man, whom Hanek positively identified as Blom in a police line-up, entered the Subway store from the outside and tried to enter DJ's Expressway through the internal connecting door. Hanek said she told the man to leave and to enter DJ's Expressway through its own external entrance. After closing, Hanek left the Subway store at about 10:30 p.m. As she walked to her car which was parked behind the dumpsters at the rear of the building, she encountered the same man who had come into the Subway store shortly after 10:00 p.m. The man was walking back and forth on the sidewalk. Hanek said the man stumbled, could not walk straight, and appeared to be intoxicated. The man asked Hanek if she was done for the evening and she told him she was. Hanek testified that the man, who was wearing jeans and a T-shirt, was standing about five to ten feet from her when he

spoke to her. The man then got into a dark-colored pickup truck and left. Hanek later testified that the man she saw was Blom and she identified him in court.

Hanek got into her car to leave and, coincidentally, started driving in the same direction as the pickup truck, following behind with no vehicles in between. Hanek followed the truck for approximately two miles before it pulled into a cafe parking lot in Moose Lake and she continued to drive on. She testified that she observed the license plate on the truck and noted that the first three numbers were 557 and the last letter was Y. She noted that the truck was a Ford F150 extended cab with white markings on the side. The state subsequently presented evidence establishing that Blom was the owner of a black extended cab Ford F150 pickup truck with white markings on the side and license plate number 557 HDY.[10]

The surveillance video was entered into evidence and showed that a white male forced Poirier out of DJ's Expressway at 11:38 p.m. on May 26. The man's face is not clear in the video. Nevertheless, two of Blom's coworkers testified and identified Blom as the man depicted in the video. Height analysis done from the video by an FBI expert in the field of photogrammetric analysis—the science of measuring the dimensions of objects appearing in photographs—indicated that the man who abducted Poirier was approximately 5'11". Photographs taken of Blom at the police station and later introduced into evidence showed that he is approximately the same height.

The abductor shown in the surveillance video wore a dark-colored shirt with white sleeves; the shirt had a New York Yankees insignia on the front left side and the number 23 on the back. Blom's brother-in-law testified that he gave the Blom family a jersey that had short white sleeves, the number 23 on the back, and a New York Yankees insignia on the front. One of Blom's coworkers testified that he contacted the police after seeing a composite sketch depicting the jersey because he had seen Blom wear a similar jersey to work. In his September 8 statement, Blom stated that he was wearing a "New York jersey" that night, which he possibly got at a garage sale or from his brother-in-law. However, at trial, both Blom and his wife testified that they do not own a New York Yankees jersey and that the brother-in-law never gave them one.

c. *Blom's Behavior Following the Time of the Abduction*

At the time of Poirier's death, Blom worked at the Minnesota Veterans Home in Minneapolis, but he did not report to work on either May 27 or 28. He reported to work on Monday, May 31, but then called the next day to resign, saying he had gotten a job starting the same day at the Minnesota Department of Transportation. The human resources manager at the Veterans Home testified that interagency transfers are usually negotiated between the two departments and she had no notice that Blom was transferring to another job. Blom testified that several

---

**10.** The police testified that after dark on June 23, they drove Blom's truck to the Subway store and DJ's in Moose Lake. They parked the truck in the approximate location where Hanek had seen a dark pickup truck on May 26. Hanek positively identified Blom's truck as the truck she had seen on May 26. The police also drove the truck on the same route Hanek had followed on her way home on May 26. She confirmed the identification of the truck and its license plate. The police also showed the truck to three persons who had seen a suspicious black truck in Moose Lake on the night of May 26. Each person identified Blom's truck as the one seen on that date.

people knew that he was quitting his job and that his employer was supportive in helping him find different work. During cross-examination, Blom's wife acknowledged that Blom never worked at the Department of Transportation. A coworker testified that Blom appeared nervous in the days following the abduction and had changed his appearance by cutting and dyeing his hair. Blom's barber confirmed that Blom received a haircut on May 29.

Following Poirier's disappearance, Blom drove a Chevrolet Suburban to work, although he usually drove the Ford F150. Blom's supervisor and a coworker testified that Blom told them he had been in an accident and totaled his Ford truck. Blom later testified that he only told his coworkers that he "smacked up his truck" and not that it was totaled. A neighbor of Blom's testified that he talked to Blom on Friday, May 28, and asked him where the truck was because the neighbor saw Blom driving the Suburban. The neighbor's curiosity was piqued because the Ford F150 was usually parked in Blom's driveway. The neighbor testified that Blom told him that the truck's transmission was broken and it was at his brother's garage until he could afford to fix it.

The state presented evidence that in an interview on June 18, Blom told the police that he had sold his truck to his brother and delivered it to his brother's house the previous month. He told the police that the truck needed a new motor because it was barely drivable. Blom's brother testified that Blom did not sell the truck to him, but suggested that Blom might have understood that he sold the truck to him.

The brother testified that he and Blom had discussed the Poirier abduction and Blom expressed concern that the police would investigate him because of his past and because investigators were looking for someone with a black truck. Blom also told his brother that he should probably get rid of the truck. The police testified that they found Blom's undamaged black extended cab Ford F150 pickup truck in his garage and that it was in good working condition.

### d. *Spreigl Evidence*

On August 2–3, 2000, a hearing was held outside the presence of the jury on whether to admit *Spreigl*[11] evidence of kidnapping and criminal sexual conduct incidents involving Blom that occurred in 1975, 1982, and 1983. The state proposed presenting this evidence to show identity and common plan or scheme.[12] In support of its request, the state argued that its proof of identity was weak because the surveillance video did not reveal the abductor's identity and because, other than Hanek, the line-up witnesses had been unsure or had identified someone other than Blom. The state asserted that there was a sufficient modus operandi nexus to admit the evidence because the victims in the prior incidents were all young, petite women, they were subdued by Blom grabbing their necks, and they were taken to secluded wooded locations and assaulted. The state noted that the surveillance video showed the abductor holding Poirier at her neck and moving her out of the store.

In response, Blom argued that the state's case for identity was strong be-

---

**11.** Evidence of other crimes or bad acts by a defendant offered to show identity, plan, knowledge, or modus operandi is commonly referred to as *Spreigl* evidence after our decision in *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

**12.** On December 10, 1999, the state gave notice to Blom and his attorneys of its intent to use Blom's prior convictions for criminal sexual assault and kidnapping to show intent, absence of mistake, and common plan or scheme.

cause of Hanek's identification of Blom as being at the crime scene, Blom's September 8 statement, and the state's two dental experts' identification of the tooth as being Poirier's. The defense, highlighting the prejudicial potential of testimony about sexual assault, argued that there was no criminal sexual conduct alleged in this case and therefore it was dissimilar to the prior incidents. Blom's counsel noted other differences between the 1983 incident and the current case, specifically that in 1983 there were two female victims instead of one, that the victims had picked up Blom who was hitchhiking, that a weapon was used, and that the victims were minors. Blom's counsel also argued that because the 1983 incident occurred almost 16 years before Poirier's abduction, its probative value was small, while its potential for prejudice was great.

The district court excluded the 1975 and 1982 incidents, but allowed evidence about the 1983 incident. Blom had pleaded guilty and was subsequently convicted of second-degree criminal sexual conduct and kidnapping for this incident. In making its decision to allow evidence of the 1983 incident, the court concluded that the state's proof on identity was weak because Blom intended to show that he falsely confessed to the crime and would be presenting evidence that the witness identifications were weak. The court found that the state gave proper notice, Blom's conviction was clear and convincing evidence of the 1983 incident, and that Spreigl evidence does not have to be completely identical to the crime at issue, but rather be "substantially similar." The court found that the 1983 incident was similar because the victims were of a younger age and were abducted to a remote wooded area. The court also noted that, even though Blom maintained there was no criminal sexual conduct with respect to Poirier, there was no way of knowing if criminal

sexual conduct occurred on May 26 and the court was not bound by Blom's description of the events. The court did not address Blom's contention that the conviction was too remote in time to have probative value.

As a result of the district court's ruling, the two female victims of the 1983 incident testified. Before each witness's testimony, the court cautioned the jury that the evidence was being offered only for the purpose of assisting the jury in determining whether Blom committed the acts on May 26, 1999, and that the jury was "not to convict the defendant on the basis" of the 1983 incident because this "might result in unjust double punishment."

The victims of the 1983 sexual assault testified that they were traveling on a rural road when they drove by Blom, who was walking. After offering him a ride, Blom got in the back seat of their car and they continued to drive. At the time of their abduction, the victims were 15 and 16 years old, 5'2" and 5'6", and each weighed between 110 and 115 pounds. At some point, Blom pulled out a knife, threatened the girls, and told them where to drive. Blom directed the girls to a remote wooded area and instructed them to exit the car, still threatening them with the knife. He then forced them to walk into the woods by holding them by the backs of their shirt collars with the knife in the other hand. Once in the woods, he tied them up, gagged them, and attempted to rape them. During the assault, he began choking one of the girls with his hands to the point that she became very red and it appeared as if she would die. He then began choking the other girl. After a time, the girls were able to escape. Blom then ran away from the scene of the assault, but was subsequently located and arrested.

### e. *Alternative–Perpetrator Evidence*

At the end of its case, the state renewed an earlier motion to prevent Blom from presenting alternative-perpetrator evidence. The state's motion was in response to the defense's plan to introduce evidence inculpating a man named Donald Christiansen as an alternative perpetrator. Before Blom became a suspect in Poirier's abduction, the police were investigating Christiansen as a possible suspect. The basis for the state's motion was that the alternative-perpetrator evidence lacked sufficient foundation. The defense responded to the motion by filing a proffer of proof regarding Christiansen. The proffer was based on testimony, but defense counsel did not identify the specific source for most of the testimony.[13] Responding to Blom's proffer of proof, the state noted that Christiansen was thoroughly investigated by the police, cooperated completely, and ultimately the police eliminated him as a suspect because there was no evidence connecting him to the crime. The defense's response was to point out deficiencies in the police investigation of Christiansen and the similarities between the purported evidence against Christiansen and the state's evidence against Blom.

The district court reviewed the facts in several cases in which the decision to exclude alternative-perpetrator evidence was upheld. Explaining that it had already reviewed both the state's and defense's investigative reports, the court then reviewed the evidence submitted in the proffer and concluded that, based on the investigative reports, there were alternate explanations for the significance of the evidence.

The district court acknowledged that there were similarities in the type of evidence against Blom and Christiansen, but the underlying explanations for the evidence pointed to different conclusions. The court noted that while some witnesses "identified" Christiansen in the surveillance video, others, such as his landlord and employer, could not. As to Christiansen's haircut, the court noted that someone accompanied him to the barbershop, telling him he should get a haircut because he looked awful. The court dismissed the proof regarding Christiansen's having a New York Yankees jersey and the knife

---

**13.** The defense offered to prove the following with respect to Christiansen:

(1) While Christiansen was serving time for another offense, he confessed to a fellow inmate by stating, "I did it, but they'll never get me for it. They got Blom now."

(2) Christiansen, who is six feet tall, 170 pounds, and had curly blond hair at the time of the abduction, looked like the abductor in the surveillance tape; his friends and coworkers identified him in the tape; and he had a New York Yankees jersey.

(3) Christiansen was on rural property approximately 35 miles northeast of Moose Lake "during the time prior to May 28," and female screams were heard from the vicinity of that property "on or about the night of May 26."

(4) Christiansen changed his appearance after the abduction by cutting his hair and growing a mustache, changed vehicles in early June, failed to show up for work from May 24 through June 4, was acting strangely and told friends that he would go to jail for doing something bad, asked a friend to get rid of a knife for him that he claimed was tainted, and fled to Texas after information about an alternative perpetrator was shown in the media.

(5) Christiansen has a history of sexual assault and aggressive behavior, including a 1995 conviction for sexual assault of a young, petite female, whom he held by the neck and shoulders, threatened with a gun, and transported in his truck to a rural area.

(6) A sexual assault victim of Christiansen, upon seeing the surveillance video, stated, "He put his hands on my shoulders by the sides of my neck, and was trying to reassure me he wouldn't hurt me[,] he was standing behind me just like in the photos of the Katie Poirier kidnapping."

because the information came from witnesses who had been untruthful to police on two or three previous occasions. As to Christiansen's strange behavior and fleeing the state, the court noted that there was evidence that Christiansen had alcohol, drug, and marital problems and that he left the state because he was charged with other crimes. As to Christiansen's alleged confession to a fellow inmate, the court concluded that the inmate was not credible. Finally, the court found that there was no direct evidence connecting Christiansen to the vicinity of Moose Lake at the time of the abduction.

■ Using a clear and convincing standard for admission of the evidence,[14] the district court concluded that the evidence in the proffer was insufficient and that there was no inherent tendency to connect Christiansen to the crime. The court also noted that Christiansen's ex-wife had been a consistent alibi for him, that Blom had given a detailed confession, and there was evidence of Poirier's remains on Blom's property. The court then granted the motion to exclude Blom's alternative-perpetrator evidence.

### Blom's Defense

Blom's defense was based on his claim that he did not commit the abduction and murder and could not have committed the crime because he was at home with his wife on the night of May 26. Both Blom and his wife testified that he was at home the night Poirier was abducted. Blom admitted to being in Moose Lake on May 25, the day before the abduction, but not the remainder of the week. He also testified

he had been in DJ's Expressway only one time—in 1998.

Blom's 20–year–old daughter and his ex-wife testified that they did not recognize Blom in the surveillance video. In addition, even though the district court had ruled against Blom's presentation of alternative-perpetrator evidence, the court did allow Blom to present the testimony of witnesses who identified Christiansen as the abductor in the video. Blom presented five witnesses, including friends and co-workers of Christiansen, who testified that Christiansen appeared to be, resembled, or was believed to be the person in the video. One of these witnesses was a woman who had been sexually assaulted by Christiansen. By instruction, the court limited the purpose of this witness's testimony to showing the weakness in the state's identification of Blom. Nevertheless, the court did permit the victim to state that she knew Christiansen because he had sexually assaulted her in the past. The court said it allowed this evidence because Blom planned to present the witnesses who identified other individuals as the abductor in the video, and thus the focus of the evidence was not to show Christiansen as an alternative perpetrator, but rather to show the weakness of the surveillance video evidence.

### Evidence Surrounding the Voluntariness of Blom's Statement

At trial, Blom acknowledged his September 8 statement, but testified that he confessed falsely because of his experiences with law enforcement in the past, the attention his case was getting in the media, and harassment of his family by law en-

---

**14.** Alternative-perpetrator evidence is admissible once a defendant establishes a foundation consisting of "evidence which has an inherent tendency to connect such other person with the actual commission of the crime." State v. Gutierrez, 667 N.W.2d 426, 436 (Minn.

2003) (internal quotation marks omitted); see State v. Jones, 678 N.W.2d 1, 16 (Minn.2004); see also Gutierrez, 667 N.W.2d at 436 n. 8 (explaining the distinction between "reverse-Spreigl" evidence and other alternative-perpetrator evidence).

forcement and the public. He stated that his family had been receiving threatening phone calls and letters, his children were being followed and were afraid, and he had heard that his wife and son were being accused as accomplices. He also stated he was willing to do anything to get out of jail. Without specifically identifying to whom he was referring, Blom testified that "they" could not guarantee the safety of his five-year-old daughter who was supposed to start kindergarten that fall. He testified that his solitary confinement drove him to make the statement. Blom further testified that when he gave the statement, he was under the influence of medications, at least one of which—Ultram—is a mood-altering drug. He also testified that he had been spitting blood for several months and doctors kept giving him antibiotics, which he believed were the wrong medications.

The state rebutted Blom's claims with Seboe's testimony that Blom received a medical screening when he was booked and met with medical personnel while in jail on at least seven occasions over a period of two and one-half months. Seboe also stated that most of the medical visits were at Blom's request. In addition to trial testimony, evidence related to the voluntariness of Blom's statement is also contained in notes he sent to Seboe in August. The state appended these notes to its memorandum for the omnibus hearing on Blom's motion to suppress the statement. On August 10, Blom sent a note asking for a review of his segregation and his 23–hour–a–day lockdown status and expressed concern over the fact that he had not been able to contact his children for weeks. While Blom claimed ill treatment at the hands of the authorities, he nevertheless sent a note to Seboe on August 26, which stated in part, "We've talked before, and I appreciate your straightforward help." Even after the statement, Blom continued to express his appreciation toward Seboe. On September 21, Blom sent a note that began "I realize you have gone to great lengths to make the last couple weeks more bearable for me while still trying to perform your job."

Additional evidence was elicited during the hearing on Blom's petition for postconviction relief. Blom testified that he communicated his concerns to both his state and federal defense counsel and said that his federal defense counsel followed up on his complaints. Seboe testified that Blom was placed in a 23–hour lockdown because of jail policy and because of rule violations, including the discovery of written plans to escape. Seboe said Blom had access to and took advantage of the jail's disciplinary appeals process. In addition, Seboe said Blom was not placed in lockdown the entire time he was in jail before making his statement and that he had made attempts to house Blom in cells with other inmates. Both Seboe and the BCA agent who had contact with Blom denied threatening him with respect to charges involving his family, denied making any promises regarding pending charges, and denied threatening Blom with respect to his wife or children. Seboe testified that on September 3 he did tell Blom that he could not allow him to make phone calls because of concerns that he might cause evidence to be destroyed.

There is also evidence in the form of rebuttal testimony taken from a licensed pharmacist who indicated that none of the medications Blom was taking would affect his cognitive ability and that if he were impaired by the medications, the effects would be observable in the form of lethargy, drowsiness, slurred speech, difficulty in walking, confusion, and decreased mental alertness. The police officers present when Blom gave his statement testified

that, based on their observations, Blom understood the questions, spoke in a normal tone of voice, had a coffee and restroom break during the interview, freely and voluntarily gave answers to questions, and was alert, lucid, cooperative, and calm. After the police finished asking their questions, Blom volunteered to meet with them again to answer more questions and even suggested a day.

*Self–Representation Request*

On August 3, 2000, while his trial was underway, Blom made a request to represent himself. This request, as clarified during questioning by the district court, was more in the nature of a request to remove his defense counsel than to represent himself. Even though the court told Blom that a request to represent himself was "not a request to allow different counsel to represent you," Blom stated that his motion was not to represent himself, but that he would "just rather do without legal attorney." When asked his reasons for wanting "to represent himself," Blom asserted that his counsel were giving him a "snow job," were "minimizing" his defense, and were not bringing out vital parts of his defense. Blom concluded by saying he wanted to "go on the record saying" he could "prove without a doubt" that his attorneys were not defending him "100 percent."

Upon receiving Blom's request, the district court first verified that Blom understood that he had the right to be represented by counsel and that if he chose to represent himself he would be held to the same standard as if he were an attorney. The court informed Blom that while he would be allowed to have counsel remain in the courtroom on a standby basis, he would have to prepare, examine, and cross-examine witnesses himself. The court told Blom first-degree murder is punishable by life imprisonment, alibi and other defenses were available, he could not make the motion to represent himself for purposes of delay, and he could not request substitute defense counsel at the same time he was asking to represent himself. The court also sought to clarify Blom's request to represent himself by asking Blom about it in three different ways, but each time Blom's response was equivocal.

A few moments after engaging in the foregoing exchange with the district court, Blom said the trial had been "going pretty good in some areas, but I think there have been too many areas that haven't been touched." The court then explained to him that his counsel probably did not address those issues because counsel understood from their legal training that they could not. The court noted Blom's dissatisfaction, but found the motion untimely and concluded that self-representation would result in disruption and undue delay. As to the adequacy of Blom's representation, the court concluded "quite honestly, I would say [your counsel] have been fighting zealously, which has been evidenced by the number of rulings and motions and requests that I have had to rule on in these proceedings."

*Verdict and Conviction*

At the end of the trial and per an agreement between the state and the defense, the lesser charge of kidnapping was dropped. The district court instructed the jury only on the first-degree felony-murder charge of causing the death of a person with the intent to effect the death of that person while committing or attempting to commit kidnapping. The jury found Blom guilty of this offense. The court then convicted Blom of the offense and sentenced him to life in prison without the possibility of parole.

*Blom's Appeal and Petition for Postconviction Relief*

Blom filed a direct appeal on November 16, 2000, but later moved to stay the direct

appeal proceedings in order to petition for postconviction relief. He sought relief from the postconviction court on the grounds that he was denied his right to effective assistance of trial counsel, to self-representation, to a fair trial on the ground of excessive media coverage, to a change of venue from the City of Virginia, and to present exculpatory evidence. He also claimed he was denied his right against self-incrimination on the ground his statement to the police was not voluntary.

A postconviction hearing was held on June 18–19, 2002 for the limited purpose of receiving evidence regarding Blom's ineffective assistance of trial counsel claim. Testimony was received from various witnesses, including Blom and his defense counsel. The issues addressed by the testimony were whether Blom's defense counsel (1) should have testified at the omnibus hearing held to determine whether Blom's September 8 statement should have been suppressed as made in connection with plea negotiations; (2) should have prevented discovery papers from being filed in the court record by both the state and the defense; (3) failed to present a sufficient proffer of proof regarding Donald Christiansen; (4) failed to provide a sufficient proffer of proof regarding its "cremation" witness; (5) dealt properly with bear bones discovered·by two men in Carlton County on August 29, 1999, which bones Blom asserted resembled human bones;[15] (6) should have examined the state's forensic expert on whether the expert believed the factual basis of Blom's September 8 statement about how he cremated Poirier's body; (7) properly dealt with the cremation expert retained by defense counsel; (8) had Blom's permission to make statements to the media that he confessed; and (9) should have moved to suppress Blom's statement based on involuntariness. The testimony also addressed Blom's (1) condition and environment as it related to his statement; (2) behavior in jail and his efforts to contact the media; and (3) frustration with his counsel, including his complaint against them to the Lawyers Professional Responsibility Board, and counsel's unwillingness to let him testify at the suppression hearing.

Blom's defense counsel, who were present when he made his statement, testified that they did not discern any influence of medications on Blom when he made the September 8 statement. Lead defense counsel testified that "there was no reason to suspect that the drugs [Blom] was tak-

---

**15.** Two men discovered the bones in question on August 29, 1999, exposed in a shallow pit surrounded by trees in Carlton County. The men thought the bones looked like those of a human whose feet, hands, and head had been cut off. They estimated that the intact skeleton would have measured 5′6″ in height. They noticed the skeleton because of the smell of something dead and discovered it lying in a shallow pit. They noted to the investigator that a pool of body fluids appeared beneath the bones.

The men called the police and two deputies were dispatched. The men reported that one deputy loaded a new role of film in a camera and both deputies went to recover samples of the bones. The men did not accompany the deputies when they recovered the samples. A defense investigator's report indicates that the deputies brought the bones to the Carlton County Medical Examiner, who examined them at his home. The report memorializing the investigator's interview with the examiner states the examiner concluded that, based on the thickness of the ribs, the bones were those of a bear and not those of a human. The report states the examiner then told the deputies to dispose of the material.

When a defense investigator contacted the police four months later in January 2000, they could not provide any photographs. The film apparently was never developed. When another investigator talked to the state's forensic anthropologist about the bones, the anthropologist stated she had not seen the bones and was surprised they had been thrown away.

ing were affecting his ability to rationally understand what he was doing." Lead counsel testified further that both he and Blom's other counsel were present when the statement was given and were able to assess whether Blom was affected by medication and would have acted immediately if there was any appearance that Blom was not mentally competent to give a statement. When Blom was first asked at the postconviction hearing whether he recalled September 8, he replied, "I recall all of it pretty good." But he changed his position a few moments later and said he did not have a clear recollection of the day. Blom's counsel also addressed the statements made to the news media immediately after Blom gave his statement. Counsel said they gave a statement to the press at Blom's request because Blom wanted counsel to notify the public that he had done the right thing despite his counsels' advice. Blom disputed requesting that counsel make this statement.

After reviewing the evidence presented at the hearing, the postconviction court denied Blom's petition. The court found that Blom's counsel "faithfully and consistently carried on the defense on behalf of [Blom] throughout the course of representation" and that Blom was defended by "an experienced and capable criminal defense attorney, who engaged in substantial pretrial preparation." The court noted that Blom's assertions of error were related to decisions made as part of trial strategy. The court concluded that Blom had "failed to prove by a preponderance of the evidence that trial counsel's conduct in its totality amounted to ineffective assistance of counsel."

Blom subsequently appealed the postconviction court's order, and that appeal was joined with his stayed direct appeal. Both appeals are now before us.

## I.

■ We first consider whether the district court abused its discretion in denying Blom's motions to change venue, continue the trial for one year, and sequester the jury. We review a court's rulings on motions to change venue, continue a trial, and sequester a jury for abuse of discretion. *See State v. Kinsky,* 348 N.W.2d 319, 323 (Minn.1984) (reviewing a district court's ruling on change of venue and continuance motions for a clear abuse of discretion); *State v. Morgan,* 310 Minn. 88, 95, 246 N.W.2d 165, 169 (1976) (reviewing a district court's decision on sequestration and continuance motions for abuse of discretion). Here, we consider the various motions together because they are factually interrelated.

A district court should grant a motion for change of venue or continuance when "the dissemination of potentially prejudicial material creates a reasonable likelihood" of an unfair trial. Minn. R.Crim. P. 25.02, subd. 3. A showing of actual prejudice is not required. *Id.* In an earlier case where a defendant claimed that the court failed to sua sponte change venue, we concluded there was no error when one change of venue motion had already been granted. *See Thompson v. State,* 289 Minn. 270, 272, 183 N.W.2d 771, 772 (1971) (stating that "[i]t is doubtful that more could have been accomplished by another change of venue since the publicity of which he complains extended throughout the state").

■ Similarly, when the issue concerns a motion to sequester, the district court shall order sequestration if it determines that the "case is of such notoriety or the issues are of such a nature that * * * highly prejudicial matters are likely to come to the attention of the jurors." Minn. R.Crim. P. 26.03, subd. 5(2). We have held that "the question of whether to

grant a continuance or to sequester a jury because of pretrial publicity is left to the sound discretion of the trial court." *Morgan*, 310 Minn. at 94, 246 N.W.2d at 168. Further, "whether the trial court abused its discretion * * * depends on whether [it] properly assessed the likelihood that prejudicial publicity would affect the impartiality of the jurors and thereby prevent a fair trial." *Id.* at 95, 246 N.W.2d at 169.

Here, it is clear that, after changing venue from Carlton County to the City of Virginia in Saint Louis County, the district court gave continuing attention and consideration to Blom's repeated requests to further change venue and to sequester the jurors. The court indicated that it shared Blom's concern that he be given a fair trial by impartial jurors. The court reevaluated the change of venue motions as new information about publicity was raised and as new jurors were seated. In each reevaluation, the court reached the same conclusion that nowhere in the state would Blom face a jury unexposed to publicity about the case. Similarly, the court denied the continuance motion because it concluded that publicity would only die down temporarily and would reoccur once the trial started. When the court rejected these motions, it stated that it had concluded that the voir dire testimony of the jurors ultimately seated demonstrated that those jurors could be fair and unswayed by public prejudice.

In *Kinsky*, the defendant argued that voir dire indicated that prospective jurors had been exposed to pretrial publicity and formed opinions about her guilt. *Kinsky*, 348 N.W.2d at 323. Similarly, Blom states that the change of venue motions were based on

negative answers to jury questionnaires; potential jurors' negative statements during voir dire; hostile public sentiment and opinion about Appellant's guilt; pressure and influence from the community on potential and actual jurors; intimidating bumper stickers and signs displayed in the parking lot of the courthouse; an incident where a person slowly drove by in a car as jurors were entering the courthouse yelling, "hang the bastard" and constant references in the media to things that had been deleted or ruled to be inadmissible.

In *Kinsky*, we concluded that prospective jurors "cannot be presumed partial solely on the ground of exposure to pretrial publicity," and "[t]he test is whether a prospective juror can set aside his impression or opinion and render an impartial verdict." *Kinsky*, 348 N.W.2d at 323. The court in *Kinsky* noted that even if it assumed several prospective jurors stricken with peremptory challenges were biased, this does not establish actual prejudice of the jury. *Id.* at 324.

▪ The facts here are similar to those in *Kinsky*. As in *Kinsky*, trial counsel's motions were based on juror answers during voir dire.[16] The 15 jurors selected in this case were individually and extensively questioned by the district court and counsel for both sides. Based on their voir dire testimony, these 15 jurors indicated that they intended to reach their verdict solely on the basis of evidence presented in court. While the jurors indicated that they had been exposed to some pretrial publicity, they agreed to follow the court's instructions and further agreed that they would be fair and impartial. A review of the jurors' answers at voir dire confirms

16. Whether trial counsel's motions were based on the answers of seated jurors or potential jurors is not clear. Counsel was

renewing its motions for change of venue even as the court was seating each juror who became qualified during the selection process.

the seriousness with which they undertook this job.

In addition to the instructions mentioned above, after each juror was selected, the district court instructed the juror further about not discussing the case with anyone, including family, attorneys, and the media. The court also emphasized that not following these instructions could jeopardize the trial and asked each juror to notify the court if anyone tried to influence or contact the juror regarding the trial. With the exception of three days, the court repeated the same warning in the same detail at the end of each trial day and also on some occasions did so when the court went into recess. The court told the jurors that just because the court was repeating the warnings every day, this did not mean that the jurors should take the warnings less seriously.

We conclude that the district court sufficiently verified that the seated jurors would be fair and impartial and did not abuse its discretion in denying Blom's motions. For all of the foregoing reasons, we hold that the court did not err when it denied Blom's motions to change the venue of his trial from the City of Virginia, to continue the trial, and to sequester the jury.

## II.

Blom next argues that the district court failed to caution all persons with a connection to his case against extra-judicial statements until significant prejudice had already resulted. He asserts that this failure violates Minn. R.Crim. P. 26.03, subd. 7, which states that "[w]henever appropriate, the court shall order attorneys, parties, witnesses, jurors, and employees and officers of the court not to make extra-judicial statements relating to the case or the issues in the case for dissemination by any means of public communication during

the course of the trial." As a general matter, courts are vested with discretion in managing trials. *State v. Erickson*, 610 N.W.2d 335, 341 (Minn.2000).

Blom acknowledges that the district court issued a gag order on September 16, 1999, but argues that the gag order was issued too late—it came after his counsel had made a statement to the news media on September 8. Blom disputes telling his counsel to give such a statement to the press, but the state correctly points out that the court had no way of knowing that Blom's counsel would be giving such a statement. The court subsequently lifted the gag order and allowed access to transcripts of closed hearings. Blom then points out that actions of the first judge who sat on his case, as well as that judge's subsequent removal from the case, drew considerable media attention. However, the first judge's actions and removal have nothing to do with Rule 26.03. Further, Blom fails to explain how he was prejudiced by the first judge's actions or media attention to the judge's removal. Blom also complains that the court records, which included both parties' discovery and investigative reports, were available to the public. This accessibility has been the standard practice in Carlton County for some time and is not related to extra-judicial statements governed by Rule 26.03, subd. 7.

The district court did issue a warning under Rule 26.03, subd. 7, on the first day of trial. Specifically, the court stated in open proceedings, "[t]his court does now therefore order, that the attorneys, parties, witnesses, jurors, employees, and officers of the court are not to make any extra-judicial statements relating to the case or the issues in the case for dissemination by any means of public communication during the course of the trial." Further, the federal court overseeing the

firearms charges against Blom issued a similar order, prohibiting the parties from making statements regarding the federal *and* state proceedings. In essence, Blom has given us no basis, factual or otherwise, on which to conclude that Rule 26.03, subd. 7 was violated. Rather, we conclude that the court, on its own initiative, adequately cautioned against extrajudicial statements and therefore hold that the court did not err in its management of Blom's trial with respect to extra-judicial statements.

### III.

■■■ Blom next argues that the district court failed to adequately control the courtroom and courthouse, in violation of Minn. R.Crim. P. 26.03, subd. 3, and therefore failed to protect jurors from prejudicial publicity. Blom also asserts that the court failed to warn the media about printing prejudicial matters that were not introduced at trial. Rule 26.03, subd. 3 provides:

> Whenever appropriate in view of the notoriety of the case or the number or conduct of news media representatives present at any judicial proceeding, the court shall ensure the preservation of decorum by instructing those representatives and others as to the permissible use of the courtroom and other facilities of the court, the assignment of seats to news media representatives on an equitable basis, and other matters that may affect the conduct of the proceeding.

Here, the court took several actions that are tangentially related to Rule 26.03, subd. 3. When reviewing such actions, we give district courts broad discretion concerning matters of courtroom procedure.

*State v. Lindsey,* 632 N.W.2d 652, 658 (Minn.2001).

After hearing arguments on behalf of the news media on whether to close certain aspects of the trial under Minn. R.Crim. P. 26.03, subd. 6(4), the district court ordered that matters considered outside the presence of the jury would take place outside the hearing of the public.[17] At the onset of voir dire, the court issued an order which required all those who entered the courtroom to show a picture I.D. and to sign in. The court limited visitors in the courtroom to unreserved seats on a first-come, first-served basis, and denied admittance to the courtroom to additional spectators if there were no more seats available. The court further ordered that those present in the courtroom must be seated at all times while the court was in session and that anyone leaving the courtroom during a session could not re-enter until a subsequent break. The court prohibited all electronic communication and recording devices from the courtroom. Further, on defense counsel's motions, the court instructed the state to instruct its witnesses to refer to Poirier as "Miss Poirier" instead of "Katie," instructed the bailiffs to remove Blom from the courtroom only outside of the jury's presence, and to give Blom discreet handcuffs.

The district court continued to address courtroom procedure throughout the trial. When defense counsel complained that one of the witnesses on the state's list was seated in the courtroom during other witnesses' testimony, the court asked the state to have the witness leave and did so without bringing attention to her leaving. Defense counsel moved for a mistrial because of the presence of armed deputies in the courtroom who were watching Blom.

---

**17.** The district court emphasized that it was not concerned about the jurors' ability to stay away from the press, but was concerned about protecting jurors from third parties trying to pass information to them.

Counsel asserted that these matters had been raised before trial precisely to avoid this kind of prejudicial attention. While the court denied the motion, stating that the conduct did not rise to the level of prejudice warranting a mistrial, it instructed the bailiffs to make sure that the armed deputies did not come into the courtroom.

We also note that Blom's trial counsel were diligent in bringing to the district court's attention the hostility that their client faced during trial. For example, somebody parked a car across the street from the courthouse with a bumper sticker that said, "Blom is guilty." When addressing this incident, the court explained that its options were limited because of freedom of speech, but asked the state to attempt to have the car removed. Blom had a confrontation with the owner of this vehicle a few days later when she was sitting behind him in the courtroom and would not stop staring at him. The court attempted to remedy this situation by reserving the two rows of seats behind Blom for his family only.

Our examination of the record gives no indication that the district court was neglectful in managing the trial. Rather, the record suggests just the opposite—the court was actively monitoring courtroom activity and properly addressing problems as they arose. Therefore, we hold that Blom's request for retrial on these grounds lacks merit.

### IV.

■ The next issue we must decide is whether the district court abused its discretion in admitting *Spreigl* evidence about the 1983 incident and the subsequent criminal sexual conduct and kidnapping convictions to show identity and common plan or scheme. We review a district court's decision on whether to admit *Spreigl* evidence for an abuse of discretion.

*State v. Kennedy,* 585 N.W.2d 385, 389 (Minn.1998). The defendant must show that the court erred and that the error was prejudicial. *Id.*

■ Evidence of past crimes cannot be used to show a defendant's character for committing those crimes, but can be used to show motive, intent, absence of mistake, identity, or a common scheme or plan. *Id.; see also* Minn. R. Evid. 404(b). A court can admit such evidence only if

(1) notice is given that the state intends to use the evidence; (2) the state clearly indicates what the evidence is being offered to prove; (3) the evidence is clear and convincing that the defendant participated in the other offense; (4) the *Spreigl* evidence is relevant and material to the state's case; and (5) the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice.

*Kennedy,* 585 N.W.2d at 389. When it is unclear whether *Spreigl* evidence should be admitted, the defendant receives the benefit of the doubt, and the evidence should be excluded. *Id.* The district court should lower the risk of prejudice by withholding its decision on admitting the evidence until the state has presented all of its other evidence and, in a close case, by holding an evidentiary hearing on whether to admit the evidence instead of simply relying on a proffer of proof. *State v. DeWald,* 464 N.W.2d 500, 504–05 (Minn. 1991). In this case, the court took both suggested procedural precautions by withholding its decision to allow the evidence until the end of the state's case and by holding an evidentiary hearing.

Blom asserts that the district court erred in admitting the *Spreigl* evidence, arguing that the state's proof of identity was not weak because the state produced an eyewitness who placed Blom and his

truck near the scene of the crime around the time Poirier was abducted, produced expert evidence that the tooth found on Blom's property belonged to Poirier, and submitted Blom's September 8 statement to the jury. Blom further argues that the *Spreigl* evidence was lacking a modus operandi connection because the 1983 case was a sexual assault, not a murder, but here the state alleged a murder, but not a sexual assault. Blom also argues that the probative value of the evidence did not outweigh its prejudicial impact on the jury.

■■■■ As to relevance and materiality, the district court should consider the issues in the case, the reasons and need for the evidence, and whether there is a time, place, or modus operandi nexus. *State v. DeBaere*, 356 N.W.2d 301, 305 (Minn.1984). The past crime does not have to be a "signature" crime, as long as the crime was sufficiently similar to the incident at issue before the jury. *State v. Cogshell*, 538 N.W.2d 120, 123 (Minn.1995); *see, e.g., State v. Slowinski*, 450 N.W.2d 107, 114–15 (Minn.1990) (finding no abuse of discretion when the incidents all involved the use of a knife, the removal of clothes, and sexual threats).

■■■ In considering the relevance and materiality of the 1983 incident, we disagree with Blom's contention that the modus operandi was "not sufficiently or substantially the same." Both incidents involved the kidnapping of young, petite women to remote, wooded areas. Both incidents also involved subduing the women by applying force at their neck and throat areas. Although the court did not address Blom's concern that the 1983 incident was too remote, we have stated that a close temporal relationship is not required, but is simply a factor in determining relevancy. *State v. Wermerskirchen*, 497 N.W.2d 235, 242 n. 3 (Minn. 1993) (observing that passage of time may be insignificant if, for example, the defendant spent a number of those years in prison or "if the older offense is part of a 'pattern' of similar misconduct occurring over a number of years" and noting that we have upheld the admission of offenses going back 19 years). Even considering the time Blom served for the 1983 incident,[18] we view the passage of time between 1983 and 1999 as troubling. However, considering the centrality of the issue of identity in this case and the similarity of the 1983 incident to the abduction of Poirier here, we conclude that the 1983 incident was relevant and material.

■■■ "Even if evidence is relevant, however, 'it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.' " *State v. Lynch*, 590 N.W.2d 75, 81 (Minn.1999) (quoting Minn. R. Evid. 403). The closer the relationship in time, place, and modus operandi between the past crime and the current charge, the less likely the evidence will be used improperly by the jury. *State v. Frisinger*, 484 N.W.2d 27, 31 (Minn. 1992) (quoting *State v. Billstrom*, 276 Minn. 174, 178–79, 149 N.W.2d 281, 284 (1967)).

> When balancing the probative value of *Spreigl* evidence against the potential for unfair prejudice, the trial court must consider how necessary the *Spreigl* evidence is to the state's case. When identity is at issue, evidence of other crimes is "admissible only if the trial court finds the direct or circumstantial evidence of defendant's identity is otherwise weak

---

18. Following his conviction for the 1983 incident, Blom, then known as Donald Pince, was sentenced to 72 months in prison. *State v.*

*Pince*, 358 N.W.2d 435, 438 (Minn.App.1984), *rev. denied* (Minn. March 6, 1985).

or inadequate, and that it is necessary to support the state's burden of proof." *Lynch,* 590 N.W.2d at 81 (citations omitted).

■ In this case, Blom asserts that the state's proof of identity was not weak, but we note that the testimony of Blom's wife provided an alibi for him, Blom was claiming that he falsely confessed to the abduction of Poirier, there was no direct physical evidence connecting Blom to DJ's Expressway, witnesses other than Hanek were not able to identify Blom at the lineup, and the defense planned to introduce its own expert testimony to establish that the tooth found on Blom's property could not be Poirier's. Further, we have held that where identity is at issue and the defendant offers an alibi, "the state may buttress its case with *Spreigl* evidence." *State v. Moorman,* 505 N.W.2d 593, 603 (Minn.1993). Evidence about the 1983 incident was not "merely cumulative" or "a subterfuge for impugning defendant's character." *Lynch,* 590 N.W.2d at 81. While the potential for prejudice was great due to the nature of the 1983 offense and the passage of time, as case law indicates, the similarity in modus operandi lowers the potential for improper use by the jury. While we acknowledge that another district court, in the proper exercise of its discretion, may have excluded this *Spreigl* evidence, we hold that here the district court did not abuse its discretion when it permitted the admission of the 1983 incident as *Spreigl* evidence.

## V.

■ Blom next argues that his right to self-representation was violated when the district court denied his request to represent himself. We review the court's denial of Blom's motion for self-representation for clear error. *State v. Christian,* 657 N.W.2d 186, 190 (Minn.

2003). The right to self-representation in state criminal trials is guaranteed by the Sixth and Fourteenth Amendments of the U.S. Constitution. *State v. Richards,* 456 N.W.2d 260, 263 (Minn.1990) (citing *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). "When a criminal defendant asks to represent himself, the court must determine (1) whether the request is clear, unequivocal, and timely, and (2) whether the defendant knowingly and intelligently waives his right to counsel." *Id.* (footnote omitted). If a defendant makes a request to represent himself after trial has already begun, the court's decision also becomes a matter of balancing between the defendant's legitimate interests in self-representation and the possibility for disruption and undue delay. *Christian,* 657 N.W.2d at 191. For purposes of determining whether this balancing test is triggered, trial begins at the onset of jury voir dire. *Id.* at 193. As to whether the defendant's waiver of his right to counsel is knowing and intelligent, a motion for self-representation is not equivocal simply because it is made as an alternative plan in case the court does not grant a defendant's motion for a different attorney. *Richards,* 456 N.W.2d at 263–64. If the defendant's right to self-representation is violated, he is entitled to a reversal and new trial. *See id.* at 263.

■ Because Blom's request for self-representation occurred 40 days into a 48-day trial, we conclude it was untimely when we balance his legitimate interest in self-representation and the likelihood of disruption and undue delay. *See Christian,* 657 N.W.2d at 193–94. In addition, Blom's request was equivocal as shown by his responses when the district court asked him three times whether he was requesting to represent himself. He did not answer the questions clearly, stating that he did not want to represent himself, but also

did not want his existing counsel. Upon further examination of Blom's reasons for his request to represent himself, the court determined that his complaints against his counsel were unfounded. Based on this record, we hold that the court's denial of Blom's request to represent himself did not violate his rights as guaranteed by the Sixth and Fourteenth Amendments of the U.S. Constitution.

## VI.

We next address the issues raised by the admission of Blom's September 8 statement. Blom asserts that his statement is inadmissible because it was involuntary or alternatively should be excluded because it falls within the protection of Minn. R. Evid. 410. Blom's challenge to the admission of his statement requires a two-part inquiry. We will initially determine whether Blom gave the statement voluntarily and, if it was, then determine whether the statement is protected by Rule 410.

 Blom asserts that his September 8 statement was given involuntarily and should have been suppressed on that ground. If Blom's statement was coerced or made involuntarily, it should have been suppressed. A defendant is deprived of constitutional due process of law if he is convicted on the basis of an involuntary confession. *State v. Camacho*, 561 N.W.2d 160, 169 (Minn.1997) (citing *Jackson v. Denno*, 378 U.S. 368, 385–86, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)).

 The state argues that Blom has waived this argument because he failed to properly raise the issue before the district court. We agree. Although Blom asserts a claim of involuntariness in his appeal to our court, in both Blom's initial pretrial omnibus memorandum and his supplemental omnibus memorandum, he argued that his September 8 statement was inadmissible under Minn. R. Evid. 410. He failed to argue that the statement was inadmissible because it was involuntary. Generally, when a defendant fails to object to a specific error at trial, the defendant forfeits his right to have the error reviewed on appeal. *State v. Quick*, 659 N.W.2d 701, 717 (Minn.2003). We do have the discretion to review such an issue on appeal using a plain error analysis. *Id.* Upon examining this issue, we conclude that the court did not err when it concluded that Blom was not entitled to a new trial on the ground that the statement was given involuntarily.

 The voluntariness of a statement must be shown by a preponderance of the evidence. *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991). To determine whether a defendant's statement was voluntary, we engage in a factual inquiry to "examine[ ] the effect that the totality of the circumstances had upon the will of the defendant and whether the defendant's will was overborne when he confessed." *Id.* In examining the totality of the circumstances, we will consider "such factors as the defendant's age, maturity, intelligence, education, experience and ability to comprehend; the lack of or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; and whether the defendant was deprived of physical needs or denied access to friends." *Id.*

 Blom argues that his September 8 statement was coerced because he was placed in solitary confinement for 23 hours a day for weeks before he gave the statement; he made the statement to protect his family from the media, the public, and the police; and he was under the influence of medication when he made the statement. He specifically asserts that the lack of access to his family and necessary medi-

cation caused him to be under stress at the time he made the statement. He also asserts that Sheriff Seboe promised better jail conditions and other concessions if he made the statement. When considering these assertions, we examine the totality of the circumstances surrounding Blom's September 8 statement to ascertain whether his assertions provide sufficient support for his claim that he made the statement involuntarily. *Pilcher,* 472 N.W.2d at 333.

The circumstances surrounding Blom's September 8 statement reveal that law enforcement officials did not pressure or coerce him to make the statement. Seboe testified that Blom was not confined in 23-hour lockdown the entire time before he made his statement and when he was, it was the result of jail policy and Blom's violation of jail rules. One such violation involved the discovery of written plans to escape. Blom had access to and used the jail's disciplinary appeals process. Seboe and the BCA denied making any threats involving charges against Blom's family. Moreover, on August 26, Blom thanked Seboe for his "straightforward help."

Furthermore, it was Blom who approached Seboe to initiate a meeting. Importantly, Blom had three of his attorneys present when he gave the statement. Blom stated on the record that it was his intention to give the statement and that he was making the statement against the advice of counsel. The questioning lasted for about three hours and Blom's handcuffs were removed not long after the questioning began. In addition, Blom was provided with coffee and a restroom break. Once the questioning was completed, Blom volunteered to meet with authorities again to answer more questions and even suggested a day.

Blom's argument that he was pressured or coerced into making an involuntary statement is also not supported by his actions leading up to the statement. On September 3, it was Blom who contacted Seboe with the request for a meeting to "resolve this matter." On the same day that Blom approached Seboe, he also met with a television news reporter at his own request. Among other things, Blom told the reporter that on the following Monday he would tell the reporter "what everybody wants to hear." Moreover, while not dispositive, the district court's finding of fact regarding Blom's subjective expectation when he gave the statement is relevant to the issue of voluntariness. In brief, the court found that Blom approached authorities indicating his intent to give a statement and that his intention to do so was independent of and uninfluenced by any plea negotiations.

The record also reveals that, even though Blom was taking prescription medications on September 8, the medications did not render his statement involuntary. Blom's lead state defense counsel testified at the postconviction hearing that "there was no reason to suspect that the drugs [Blom] was taking were affecting his ability to rationally understand what he was doing." Law enforcement officers present when the statement was given observed that Blom understood the questions, spoke in a normal tone of voice, freely and voluntarily gave answers to questions, and was alert, lucid, cooperative, and calm. There is also evidence in the record indicating that the medications Blom had taken would not affect his cognitive ability or cause stress. In addition, if Blom had been impaired by the medications, expert testimony at trial indicates that the effects should have been observable in the form of lethargy, drowsiness, slurred speech, difficulty in walking, confusion, and decreased mental alertness. There is nothing in the text of the statement or the testimony of those who observed Blom when he gave

the statement to indicate he was suffering from any of the foregoing symptoms. Finally, we note that Blom was 50 years old at the time he gave the statement and had prior experience with law enforcement.

For all the reasons stated above, we conclude that, when addressed on its merits, Blom's claim that his statement was made involuntarily lacks substance. Therefore, we hold that Blom's statement was not inadmissible on the ground that it was given involuntarily.

## VII.

Because we conclude that Blom's statement was given voluntarily, there is no constitutional basis for its suppression. Therefore, we proceed to address Blom's alternative argument that the statement should be excluded under Minn. R. Evid. 410. Blom contends that the statement was made in connection with a plea negotiation and, therefore, Rule 410 prohibits its admission. Rule 410 provides:

> Evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime *or of statements made in connection with any of the foregoing pleas or offers,* is not admissible in any civil, criminal, or administrative action, case, or proceeding whether offered for or against the person who made the plea or offer.

(Emphasis added.) The rule's plain language gives a district court little discretion to admit a defendant's statement if the statement is "made in connection with" a plea or plea offer. Whether a statement is "made in connection with" a plea or plea offer requires an inquiry as to the facts of each case.

Our standard of review is responsive to the nature of this inquiry. We give deference to the district court's factual determinations, but still make an independent determination whether—as a matter of law—the statement was made in connection with a plea or plea offer. Thus, we review the court's findings of fact under a clearly erroneous standard, but review de novo the court's legal conclusion that Rule 410 does not protect Blom's statement. *Cf. State v. Fields,* 679 N.W.2d 341, 345 (Minn.2004) ("Although appellate courts review the presence or absence of historical facts for clear error, the surrounding circumstances relevant to a Sixth Amendment determination are reviewed de novo."); *State v. Miller,* 573 N.W.2d 661, 670 (Minn.1998) (stating that an appellate court reviews a district court's findings of fact for clear error, but "makes an independent review * * * of the district court's determination regarding custody and the necessity of a *Miranda* warning").

The district court in this case concluded that Rule 410 did not prohibit the admission of Blom's statement because the statement "remained separate and distinct from any plea negotiations" and that Blom "knowingly and voluntarily" waived the rule's protections. We first address whether Blom waived the protections of Rule 410. Then, if necessary, we will address whether Blom's statement was made in connection with a plea or plea offer such that it is encompassed by Rule 410's protections.

In general, we recognize that plea bargains are essential to the administration of justice. *See State v. Jackson,* 325 N.W.2d 819, 822 (Minn.1982); *see also Santobello v. New York,* 404 U.S. 257, 260, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (encouraging plea bargains in state and federal cases). With proper safeguards, pleas should be a most frequent means for the disposition of criminal cases. *Jackson,* 325 N.W.2d at 822. The purpose of Rule 410 is "to encourage frank discussion in plea bargain-

ing negotiations." *See United States v. Arroyo–Angulo*, 580 F.2d 1137, 1148 (2d Cir.1978); *see also Jackson*, 325 N.W.2d at 822. In order to further this policy and ensure fruitful negotiations, Rule 410 safeguards the confidentiality of plea negotiations by precluding the evidentiary use of plea-related statements in the event that plea negotiations abort. *Jackson*, 325 N.W.2d at 822. "Meaningful dialogue between the parties would, as a practical matter, be impossible if either party had to assume the risk that plea offers would be admissible in evidence." *United States v. Verdoorn*, 528 F.2d 103, 107 (8th Cir.1976).

▅▅▅▅ The evidentiary safeguards provided for under Rule 410 for statements made in connection with a plea or plea offer nevertheless may be waived. It is a well-established principle of law that a defendant may waive the protections of evidentiary rules. *Stevens v. Minneapolis Fire Dep't. Relief Ass'n*, 219 Minn. 276, 280, 17 N.W.2d 642, 645 (1945). We have held that a defendant may waive the protections of the hearsay rule by failing to object to inadmissible evidence at trial. *State v. Hamilton*, 268 N.W.2d 56, 63 (Minn.1978). Indeed, a defendant may even waive fundamental constitutional rights. For example, we have held that a defendant may waive his or her constitutional right under the Confrontation Clause to be present at trial, if his or her conduct is disorderly. *State v. Jones*, 311 Minn. 176, 182, 247 N.W.2d 427, 431 (1976). A defendant may also waive his or her physician/patient privilege and thereby permit the admission of some of the confidential medical records. *State v. Gore*, 451 N.W.2d 313, 318–19 (Minn.1990). Moreover, the United States Supreme Court has held that a defendant may under certain circumstances waive the federal version of Rule 410 as a condition of a plea agreement. *United States v.*

*Mezzanatto*, 513 U.S. 196, 210, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995) (holding that a defendant's agreement to allow any statement made during a meeting with a federal prosecutor to be used for impeachment purposes is a valid and enforceable waiver of the exclusionary provisions of the federal rules).

▅▅▅▅ Waiver "is an intentional relinquishment of a known right or privilege, and its validity depends * * * upon the particular facts and circumstances surrounding the case." *State v. Richards*, 456 N.W.2d 260, 264 (Minn.1990) (internal quotation marks omitted). However, a waiver, even of a constitutional right, need not be explicit. *See Illinois v. Allen*, 397 U.S. 337, 342–43, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). A court may imply a waiver from a defendant's conduct. *See State v. Gillam*, 629 N.W.2d 440, 451–52 (Minn.2001). For example, we have held that, when a defendant voluntarily absents himself or herself from a courtroom, that action constitutes a waiver of the Confrontation Clause right to be present at all stages of trial. *State v. Worthy*, 583 N.W.2d 270, 277–78 (Minn.1998). In *Worthy*, the defendants absented themselves from trial as part of a tactical attempt to delay their trial in order to be the last of multiple defendants tried. *Id.* at 277. We stated that the "[d]efendants cannot take advantage of their own willful choice to defeat the ends of justice and must be held to have waived their right to be present at trial under these facts." *Id.* at 277–78.

▅▅▅ It is necessary to examine the highly unusual facts of this case to determine whether Blom's actions constituted a waiver of Rule 410's protections. The record shows that shortly after Blom finished giving his September 8 statement, his state and federal defense counsel met with members of the news media who had assembled outside the jail facility where

Blom was being held. His lead state defense counsel began this meeting by announcing:

> Donald Blom has been down speaking to authorities for several hours. In the course of speaking to the authorities, he has admitted to both the kidnapping and the killing of Katie Poirier. * * * The matter will now in all likelihood be referred to a grand jury and the matter will proceed from there.

Following this statement, Blom's state defense counsel initially refused to give any more details concerning Blom's statement, but did give an opinion, in response to a question, that authorities would not need to start a search for Poirier's body. Also, when a reporter asked if the bone fragments found on Blom's property were Poirier's, Blom's state defense counsel said "yes." When asked by a reporter if the tooth found on the property was Poirier's, he responded, "I don't think the statement is that specific, * * * I don't want to go into the details of it any further now." The foregoing statements were made to the media even though the plea agreement did not call for any public disclosure of Blom's statement or its contents. Blom's state defense counsel told reporters that Blom "made this statement out of his feelings for the Poirier family and certainly out of feelings for his own family. He wanted to get the matter behind him."

After his conviction, Blom petitioned for postconviction relief on the ground of ineffective assistance of counsel. One of the reasons Blom argued that state defense counsel was ineffective was because counsel made a statement to the media following Blom's September 8 statement. At the hearing on Blom's postconviction petition, Blom acknowledged that he had requested his counsel to make media appearances and give press conferences "quite a few times." Nevertheless, Blom denied giving any general consent for his state defense counsel to make any statements to the media on September 8. Blom also denied giving specific consent to his state defense counsel to tell the media that he killed Poirier and that the bones found in his fire pit were hers. Even though Blom had access to newspapers and television, he asserted that he did not learn of his state defense counsel's statements to the media until approximately 10 days after September 8.

Blom's lead state defense counsel testified at the postconviction hearing that he had Blom's permission to talk to the media on September 8. Counsel explained that he told Blom specifically that he would tell the media that Blom gave the statement to bring an end to the case and to ease the minds of his family and the Poirier family. Counsel testified about what happened as follows:

> There were no limitations placed upon me. Mr. Blom was anxious that we say something concerning the confession and his reasons for giving the confession. I told him very specifically that I was going to say that he gave the statement or confession to bring an end to the case, because to ease the minds of his family and in part to ease the minds of the Poiriers. Now, those were not the exact words I used, but they were very close[ ] to what I used when I gave the statement.

Counsel then added that he and Blom

> went over the fact that we would say that he did this against the wishes of his attorneys. The objective was for Mr. Blom to at least come out looking like he was doing this, that he had regrets, and that even with the advice of his attorneys not to do this, * * * he went ahead and did it for these noble purposes. And Mr. Blom was very aware that I

was going to say that to the press. We went over it before I went out there.

Lead state defense counsel also testified that Blom was the only other person present when Blom directed him to go to the media.

Supplementing, and not in conflict with the testimony of Blom's lead state defense counsel, Blom's federal defense counsel testified at the postconviction hearing that he was "not aware of what conversations, if any," Blom and state defense counsel had regarding authority for state defense counsel to make a statement to the media on September 8. Blom's second chair state defense counsel confirmed under oath that Blom had asked several times for his counsel to contact and make statements to the media and that following Blom's September 8 statement there was "definitely a request [from Blom] to go to the media, to make a statement." Counsel testified further that she could not recall a discussion of what was going to be said to the media on September 8.

Following the hearing on Blom's claim that he received ineffective assistance of counsel, the postconviction court denied Blom's petition. The court found that Blom failed to show by a fair preponderance of the evidence that his state defense counsel's "performance fell below an objective standard of reasonableness" or that there was "a reasonable probability that, but for the alleged errors, the result of the trial would have been different." It is implicit in these findings that the court found the testimony of lead state defense counsel to be credible. We conclude from the court's findings and from the record that Blom instructed his state defense counsel to talk to the media following the completion of Blom's statement to authorities. Moreover, it is implicit in the court's

findings that Blom's lead state defense counsel was credible in testifying that Blom wanted him to make a statement to the media to bring an end to the case, to ease the minds of Blom's family and the Poirier family, and that Blom placed no limitations on what was to be said to the media about his statement in which he admitted to the kidnapping and killing of Poirier. This was tantamount to a public admission that Blom kidnapped and killed Poirier.

Blom's conduct in the days leading up to the giving of his statement lends support to what is implicit in the postconviction court's ultimate conclusion. Following a pretrial omnibus hearing, the district court found that on September 3, Blom requested a meeting with Seboe to "resolve this matter." Seboe testified that he met with Blom and that Blom "said he had his mind made up, and he knew what he was going to do." The court noted that on September 3, Blom met with a television news reporter and "disclosed details regarding the abduction and murder of Katie Poirier." In a news report based on this meeting, the reporter stated that Blom had promised he would tell the reporter "what everybody wants to hear" if the reporter returned in a few days. The court found that Blom's requests to Seboe and his disclosures to the reporter prompted a meeting between Blom, the Sixth Judicial District Chief Public Defender, Blom's federal defense counsel, and law enforcement personnel regarding Blom's desire to resolve the matter. This meeting was held on the evening of September 3.

 Blom's actions following the September 8 statement are analogous to a defendant waiving the physician/patient privilege by disclosing in open court information covered by that privilege.[19] *See*

---

**19.** That is not to suggest that a defendant may

waive the protections of Rule 410 by making

*Gore*, 451 N.W.2d at 318–19. In *Gore*, the defendant testified, in support of his insanity defense to a charge of murder, that he ingested a potentially lethal amount of medication and slashed his wrists. *Id.* at 317–18. We held that, by his testimony, the defendant impliedly waived the physician/patient privilege and it was proper for the district court to allow the defendant's treating physician to give limited testimony that the defendant had taken a non-lethal dose of medication and that he had only superficial cuts on his wrists, and thus impeach the defendant's claim that he had tried to commit suicide. *Id.* at 317–19. This holding was centered on the principle that a "privilege ought not to afford a 'license to perjury.'" *Id.* at 318. We noted that

> [it] is a spectacle fit to increase the layman's traditional contempt for the chicanery of the law when a [party] describes at length to the jury and a crowded courtroom the details of his supposed ailment and then is permitted to suppress the available proof of his falsities by asserting that he wishes to keep the matter confidential.

*Id.* (quoting 8 John Henry Wigmore, *Evidence*, § 2389 at 859 (McNaughton rev. 1961)). We further stated that by disclosing the privileged information, the privilege holder destroys the information's confidentiality and the information loses its privileged character. *Id.* at 318–19.

Just as the physician/patient privilege safeguards the confidentiality of physician/patient communications in order to foster open and honest communications between physicians and patients, Rule 410 safeguards the confidentiality of plea negotiations in order to foster meaningful dialogue between the parties and to promote

the disposition of criminal cases by compromise. *See Jackson*, 325 N.W.2d at 822. By directing his state defense counsel to talk to the media about his statement to the authorities in which he admitted to kidnapping and killing Poirier, Blom negated the confidentiality of the plea negotiations and thus his September 8 statement lost the protections afforded by the rule. *Cf. Gore*, 451 N.W.2d at 318–19. It would be "a spectacle fit to increase the lay[person]'s traditional contempt for the chicanery of the law" to permit Blom to suppress his statement to authorities by asserting that Rule 410 protects the statement's confidentiality after he authorized his counsel to make a public statement to the media about Blom's statement in which he admitted to both the kidnapping and the killing of Poirier. *See id.*

Blom's statement to authorities was part of a larger "media event." A few days before his statement, Blom promised details of the crime. Blom then made the statement to authorities. And finally, Blom followed up on his promise to the media by directing his counsel to make a statement to the press. Under these highly unusual facts, Blom cannot take advantage of his willful choice to defeat the ends of justice by utilizing the protections of Rule 410. *See Worthy*, 583 N.W.2d at 277–78. Accordingly, we hold that Blom waived the evidentiary protections of Rule 410 and therefore the district court did not err when it concluded that Blom's confession was admissible. Because we affirm the district court's conclusion that Blom waived the protections of Rule 410, it is unnecessary to address whether Blom's statement was made in connection with a plea or plea offer.

---

a statement in open court. Rule 410 protects "statements made with respect to a plea in court proceedings by a defendant who later withdraws his plea." *Jackson*, 325 N.W.2d at 822.

## VIII.

Blom argues that his constitutional right to present a defense was violated because the district court granted the state's motion to exclude his evidence of an alternative perpetrator—Donald Christiansen. While the court rejected most of the evidence included in Blom's proffer of proof, it did allow the testimony of five witnesses, including one former sexual assault victim of Christiansen, who identified Christiansen as the person in the surveillance video. The court allowed this testimony for the limited purpose of showing the weakness in the identification of Blom based on the video.

The right to present witnesses in one's defense is constitutionally protected. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 302, 93 S.Ct. 1038. Where identity is at issue, this includes evidence tending to show that an alternate person committed the crime. *See State v. Hawkins*, 260 N.W.2d 150, 158 (Minn.1977). However, with that right comes the obligation to comply with procedural and evidentiary rules. *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038. The defense must establish a proper foundation by providing " 'evidence having an inherent tendency to connect such other person with the actual commission of the crime.' " *Hawkins*, 260 N.W.2d at 159 (quoting *Marrone v. State*, 359 P.2d 969, 984 (Alaska 1961)). "This requirement avoids the use of bare suspicion and safeguards the third person from indiscriminate use of past differences with the deceased." *Id.* The purpose of alternative-perpetrator evidence is to create reasonable doubt that the defendant committed the crime; it is not to prove the guilt of the alternative perpetrator. *Id.* at 158–59. Once a proper foundation has been laid, the defendant may introduce other evidence tending to show that the alternative perpetrator committed the crime. *Id.* at 159. The state can offer rebuttal evidence. *Id.* at 159–60.

Blom attempted to establish a proper foundation for his alternative-perpetrator evidence by submitting a proffer of proof based on testimonial evidence that would establish that Christiansen was Poirier's abductor. The district court concluded that Blom's proffer of proof failed to present clear and convincing evidence of Christiansen's connection to the crime. However, Blom's proffer of proof is not subject to the higher clear and convincing evidence standard, given that this is part of his constitutional right to present a defense. He is only required to present evidence having an inherent tendency of linking Christiansen to Poirier's abduction. *See State v. Jones*, 678 N.W.2d 1, 16–17 (Minn.2004); *State v. Gutierrez*, 667 N.W.2d 426, 436 (Minn.2003). The evidence that Blom submitted in his proffer of proof that would sufficiently connect Christiansen to Poirier's abduction was (1) a statement to the police by Christiansen's cellmate that Christiansen confessed that he abducted Poirier, and (2) several witnesses' identifications of Christiansen in the surveillance video. These identifications included one by a sexual assault victim of Christiansen.

As to the first item, the cellmate's statement is evidence connecting Christiansen to the crime and therefore Blom should have been allowed to present the cellmate's testimony to the jury. *See Hawkins*, 260 N.W.2d at 159. We conclude that the district court inappropriately made a credibility assessment in rejecting the cellmate's testimony when all that was required was a determination of whether the inherent tendency connection, beyond a bare suspicion, had been made.

*See id.* It is the jury's role to assess the credibility of the evidence and the state may present rebuttal evidence for the jury to consider in making its decision.

As to the witness identifications of Christiansen as the abductor in the surveillance video, these identifications also established a sufficient inherent tendency to connect Christiansen to the abduction. We reach this conclusion after examining the testimony of these witnesses. Two of the witnesses stated that the man in the video resembled Christiansen, but the other three positively identified him as the man in the video. One of the three was a sexual assault victim who testified that she believed she recognized Christiansen in a still photo made from the video, and was permitted by the court to briefly state that she recognized Christiansen because he had sexually assaulted her in the past. The remaining two witnesses were a married couple who had also known Christiansen. Both witnesses pointed out several physical features of the man in the video that led them to positively identify Christiansen. These features were hair length and color, structure of face, overall stance, shape of chin, length of arms and upper torso, height, build, body structure, and the way he was wearing his clothes.

■ We conclude that these identifications, as well as the cellmate's statements to the police, provided sufficient foundation for Blom to present alternative-perpetrator evidence tending to incriminate Christiansen. This alternative-perpetrator evidence included evidence that Christiansen had a New York Yankees Jersey, changed his appearance after the abduction,

changed vehicles in early June of 1999, failed to show up for work from May 24 through June 4, 1999, was acting strangely and told friends that he would go to jail for doing something bad, asked a friend to get rid of a knife for him that he claimed was tainted, and fled to Texas. Blom's proffer also included evidence that Christiansen was on property approximately 35 miles away from Moose Lake sometime before May 28 and that female screams were heard from the property "on or about the night of May 26." In addition, if the clear and convincing standard for reverse-*Spreigl* evidence is met, Christiansen's 1995 conviction for sexual assault of the woman who identified Christiansen in the surveillance video also should have been admitted.[20] Accordingly, we conclude that the district court erred in denying Blom the right to fully present evidence of an alternative perpetrator.

■ The foregoing conclusion, however, does not complete our analysis of this issue. A harmless error analysis applies to the erroneous exclusion of evidence that violates the defendant's right to present evidence. *State v. Post,* 512 N.W.2d 99, 102 (Minn.1994). "In applying the harmless error test, we 'must look to the basis on which the jury rested its verdict and determine what effect the error had on the actual verdict. If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt.'" *State v. Quick,* 659 N.W.2d 701, 716 (Minn.2003) (quoting *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997)). The relevant inquiry in this case is wheth-

---

**20.** Once proper foundation has been established, reverse-*Spreigl* evidence can be admitted to show the alternative perpetrator's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," regarding the crime at issue, so long as the evidence of the alternative perpe-

trator's past crimes or bad acts is clear and convincing, the evidence is relevant to the defendant's case, and the probative value of the evidence outweighs its potential for unfair prejudice. Minn. R. Evid. 404(b); *see State v. Johnson,* 568 N.W.2d 426, 432–34 (Minn. 1997).

er a reasonable jury would have reached the same verdict "if the evidence had been admitted and the damaging potential of the evidence fully realized." *Post,* 512 N.W.2d at 102. "If, on the other hand, there is a reasonable possibility that the verdict might have been different if the evidence had been admitted, then the erroneous exclusion of the evidence is prejudicial." *Id.* Blom has the burden of showing prejudice. *See Quick,* 659 N.W.2d at 716.

■ After reviewing all the evidence in the record, we conclude that Blom was not prejudiced because there is no reasonable possibility that the verdict might have been different if all of the alternative-perpetrator evidence had been admitted. We reach this conclusion for multiple reasons. Hanek, an independent witness totally unknown to Blom except for their brief encounter on the night of Poirier's abduction, positively identified Blom at the police line-up as being the person she saw in and around the property of DJ's Expressway on the night of the abduction. Her identification was confirmed by the fact that Blom owns a pickup truck identical to the truck that Hanek saw the person driving that night. Hanek described a truck that was similar in make, model, and color to Blom's. The license plate of Blom's truck also matched the characters and positioning of the four license plate characters that Hanek was able to provide to the police from her observation of the truck that night. We find this evidence compelling, especially in light of Blom's denial that he was in Moose Lake on May 26.

The state also presented evidence of the presence of human female bones and a tooth similar to Poirier's on Blom's property. Blom's failure to report to work after the abduction and his false explanations for the disappearance of his truck further support our conclusion. In addition, the

height analysis based on the surveillance video and evidence that Blom owned a New York Yankees jersey also give weight to the evidence against Blom. Finally, in his September 8 statement, Blom admitted that he killed Poirier. All these reasons amply support our conclusion that there is no reasonable possibility that the jury's verdict might have been different if all of the alternative-perpetrator evidence had been admitted. Moreover, and importantly, the jury ultimately did hear five witnesses who testified that Blom's purported alternative perpetrator appeared to be, resembled, or was believed to be the person in the surveillance video. Accordingly, we hold that the jury's guilty verdict was surely unattributable to the court's erroneous exclusion of the alternative-perpetrator evidence.

IX.

Finally, Blom argues that he was denied effective assistance of trial counsel. After Blom filed a direct appeal to our court, he filed a motion to stay the proceedings so that he could request a postconviction hearing in order to develop the record for his ineffective assistance claim. A postconviction evidentiary hearing was granted for the limited purpose of determining whether the performance of Blom's trial counsel was deficient. The postconviction court rejected Blom's claim. Blom eventually appealed this order and then filed a motion to merge the postconviction and direct appeals.

■ The Sixth Amendment guarantees a defendant the right to reasonably effective assistance of trial counsel. *Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We review ineffective assistance of counsel claims de novo. *See State v. Rhodes,* 657 N.W.2d 823, 842 (Minn.2003). Our obligation in considering postconvic-

tion proceedings is to review both questions of law and of fact. *Butala v. State*, 664 N.W.2d 333, 338 (Minn.2003). We review legal issues de novo. *Id.* However, our review of factual matters is limited to "whether there is sufficient evidence in the record to sustain the postconviction court's findings." *Id.* Here, as in *Rhodes*, the appeal from the postconviction order rejecting an ineffective assistance of counsel claim was merged with the remaining issues on the direct appeal that had been stayed. *See Rhodes*, 657 N.W.2d at 839 n. 6.

The test for determining whether a defendant was denied effective assistance of trial counsel is whether counsel's performance was deficient and, if so, whether the verdict would have been different but for this deficiency. *State v. Doppler*, 590 N.W.2d 627, 633 (Minn.1999) (citing *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). We need not evaluate both factors if either one is determinative. *Rhodes*, 657 N.W.2d at 842. The court uses an objective standard of reasonableness in evaluating an attorney's performance. *State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986). Further, "counsel must have the discretion and flexibility to devise a trial strategy that best serves the client." *State v. Brocks*, 587 N.W.2d 37, 43 (Minn. 1998).

Blom asserts nine different claims why a new trial is warranted because his trial counsel were ineffective. We have reviewed Blom's claims against his trial counsel one by one and conclude they are without merit. Our analysis of each claim is as follows.

Blom first asserts that his lead state defense counsel did not have his consent to admit his guilt at the September 8 press conference. Blom's counsel testified at the postconviction hearing that Blom specifically asked him to talk to the press about Blom's September 8 statement in which Blom admitted to both the kidnapping and the killing of Poirier. Counsel testified as follows:

Q. Mr. Brodin, my question to you is, did you personally have any conversation or authorization from the defendant to talk to the press on that date?

A. I did.

Q. Did you obtain that permission from him prior to going out after the statement and talking to the press?

A. Absolutely.

Q. What sorts of limitations did the defendant put on you with respect to your release to the press?

A. There were no limitations placed upon me. Mr. Blom was anxious that we say something concerning the confession and his reasons for giving the confession. I told him very specifically that I was going to say that he gave the statement or confession to bring an end to the case, because to ease the minds of his family and in part to ease the minds of the Poiriers. Now, those were not the exact words I used, but they were very closed [sic] to what I used when I gave the statement.

Q. Mr. Brodin, was that at a time subsequent to the statement, but prior to you leaving the doors of the jail facility?

A. It was. And we also went over the fact that we would say that he did this against the wishes of his attorneys. The objective was for Mr. Blom to at least come out looking like he was doing this, that he had regrets, and that even with the advice of his attorneys not to do this, which was true, he went ahead and did it for these noble purposes. And Mr. Blom was very aware that I was going to say that to the press. We went over it before I went out there.

Blom denies making this request, but on this claim and others, the postconviction court found that Blom failed to prove by a preponderance of the evidence that trial counsel's conduct amounted to ineffective assistance of counsel. Further, counsel's statements were not prejudicial under *Strickland* in any event because all the jurors stated during voir dire that they would be able to decide the case solely on what they heard in the courtroom. Finally, Blom's September 8 statement was admitted at trial so the jurors had before them what Blom actually said in the statement.

■ Blom next asserts that his trial counsel should have testified at the omnibus hearing to show that the September 8 statement was part of a plea agreement. Blom's trial defense team, after discussion, decided not to have Blom's lead counsel testify at the omnibus hearing because the team believed that the law was clear that the September 8 statement was part of the plea agreement. We conclude that this decision falls in the realm of trial strategy and therefore does not rise to the level of ineffective assistance of counsel.

■ Third, Blom asserts that his trial counsel failed to provide evidence regarding the coercive conditions of his incarceration. Here, the postconviction court concluded counsel "effectively brought facts before the court relating to conditions of confinement." Moreover, we have already concluded that the evidence shows that Blom's September 8 statement was voluntary. Therefore, we conclude that this assertion lacks merit.

■ The fourth claim raised by Blom is that his trial counsel gave an insufficient proffer of proof regarding the alternative perpetrator. Here again, the postconviction court found counsel effectively brought the facts before the court, and we

agree. Moreover, we have already held that the proffer was sufficient and that the district court erred in not admitting the evidence, but the error was harmless.

■ Blom's fifth claim is that his trial counsel gave an insufficient proffer of proof regarding a cremation expert. Blom does not explain how the proffer of proof for his cremation expert was insufficient. The hearing on the state's motion to exclude Blom's cremation expert for surprise and irrelevance indicates that the expert was a substitution for two other experts originally submitted by Blom who withdrew from the case before trial. Blom's trial counsel intended to proffer the testimony of the cremation expert to show that Blom's September 8 statement had to be false because of the way Blom described incinerating Poirier's body without an accelerant. The court granted the state's motion, not on the basis of surprise, but on the ground that the introduction of this witness at that stage of the trial proceedings was untimely and irrelevant. We conclude that trial counsel was not deficient here; rather, the district court exercised its discretion to exclude the testimony after considering the situation.

■ Blom's sixth claim is that his trial counsel were unprepared. After reviewing the trial transcript, the records of the numerous hearings and voir dire, the numerous motions and memoranda filed by defense counsel, the voluminous reports filed by the defense's private investigator, and the trial record, it is evident that Blom's trial counsel were well-prepared despite the huge task they faced. Counsel vigorously defended Blom's right to a fair trial. Blom's counsel were prepared to defend Blom from the time they first represented him and throughout all the subsequent proceedings, including the trial. We conclude that this claim lacks merit and Blom

has provided us with no evidence to conclude otherwise.

■ Blom's seventh claim is that his trial counsel failed to sufficiently cross-examine the state's forensic anthropologist. Blom fails to give reasons for his conclusion that his counsel's cross-examination of the forensic anthropologist was deficient. Our reading of the cross-examination reveals no deficiency. Counsel brought out on cross-examination that the anthropologist was not present at the excavation, that the bones were commingled, that there may have been bones from more than one human in the pit, that there were no complete bones, and that the anthropologist could not determine the cause of death.

Blom also claims that his trial counsel did not elicit sufficient information regarding the "bear bones" found in Carlton County on August 29, 1999. However, Blom fails to give an explanation or any basis for this assertion. Our review of the record indicates that Blom has failed to raise a valid issue with respect to these bones. The Carlton County Medical Examiner examined the rib bones recovered from the pit and determined that the bones were not human and likely belonged to a bear.

■ Blom's final ineffective assistance of counsel claim is that his trial counsel failed to prevent discovery and investigation reports from being filed in the court record, which made the reports accessible to the public. At the postconviction hearing, Blom's trial counsel testified that it has been standard practice in Carlton County to file discovery papers and investigative reports in the court record for at least the last 27 years; therefore, we conclude that this claim lacks merit.

In sum, for the reasons stated above, we hold that Blom's numerous claims of ineffective assistance of trial counsel are without merit.

In conclusion, we acknowledge that Blom's trial presented many complex and difficult issues. But the district court and counsel for both the state and Blom demonstrated a high degree of skill and competence in dealing with these issues. Moreover, our extensive review of the record leads us to the firm conclusion that while Blom may not have received a perfect trial, he definitely received a fair trial. *See State v. Greenleaf,* 591 N.W.2d 488, 505 (Minn.1999) (stating "the constitutional right to a fair criminal trial does not guarantee a perfect trial"). Therefore, we affirm the jury's verdict, the district court's entry of a conviction for first-degree murder, Blom's sentence to life in prison without the possibility of parole, and the district court's denial of Blom's petition for postconviction relief.

Affirmed.